**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| TYNTEC INC., a Delaware Corporation, and TYNTEC GROUP LTD. f/k/a Phoenix Spring Ltd., a United Kingdom Corporation, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 8:17-cv-591-T-26-MAP |
| SYNIVERSE TECHNOLOGIES, LLC, a Delaware Corporation | ) | |
| Defendant. | ) | |

**DECLARATION OF DR. PARKER M. NORMANN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Dr. Parker M. Normann, declare as follows:

## I. INTRODUCTION

1. My name is Parker M. Normann. I am an economist and a Partner at Edgeworth Economics, L.L.C. ("Edgeworth"). Edgeworth is a consulting firm that provides clients with expert economic and financial analysis for complex litigation and public policy debates. Amongst other areas of specialization, Edgeworth provides research and analysis in the field of applied economics, including the economics of competition and industrial organization. A substantial portion of Edgeworth's consulting work, as well as my own work, includes allegations of monopolization and abuse of market power.

2. I have provided economic consulting services and testimony for plaintiffs and defendants in a number of antitrust liability, damages, and class certification cases, and have testified at trial and in deposition regarding a variety of business practices. These include, for example, cases involving allegations of price fixing, monopolization, and vertical

foreclosure. I have experience with monopolization and market power issues in a range of industries including pharmaceuticals, manufacturing, and transportation.

3. I hold a Ph.D. in economics from George Mason University. Prior to that, I completed my B.S. in economics from Lehigh University. My curriculum vitae, which includes a list of my prior expert testimony, is appended to this declaration as **Appendix A**.

4. Edgeworth is being compensated for my time at a rate of $850 per hour. In preparing this declaration, I was assisted by others at Edgeworth. I have directed the activities of my support team and made all final decisions concerning the analyses contained in, and the preparation of, this declaration. Members of my team working on this matter with me have rates ranging between $230 and $500 per hour. Payment for Edgeworth's services and analyses is in no way contingent upon the outcome of this litigation.

## II. ASSIGNMENT

5. I have been asked by counsel for tyntec Inc. and tyntec Group Ltd. (collectively, "tyntec") to conduct an economic analysis of the inter-carrier vendor ("ICV") services industry. Specifically, I have been asked to determine what relevant markets exist for ICV services, whether Syniverse Technologies, LLC ("Syniverse") likely has market power in one or more relevant antitrust markets in the ICV services industry, whether Syniverse has excluded, or could exclude, competition in the sale of ICV services, and whether Syniverse's refusal to continue peering with tyntec without either firm charging the other may adversely affect competition in the provision of text messages and multimedia messages between different telecommunications providers.

6. In preparing this declaration, I, and economists working under my direction,

conducted interviews[1] and reviewed declarations, litigation filings, and publicly available information. The opinions expressed in this declaration are based on my review of this information as well as my training and experience as an economist. A list of the materials which I relied upon to develop my opinions is attached as **Appendix B**. I understand that discovery in this matter has not yet commenced. The opinions described in this declaration are based on the information currently available to me. I reserve the right to amend, update, or supplement any analysis in this declaration as new information is produced.

## III. SUMMARY OF CONCLUSIONS

7. The preliminary conclusions I have drawn to date are as follows:

- The likely relevant product market is the transmission of text and multimedia messages (also known as "SMS" and "MMS" messages) between different wireless carriers as provided by inter-carrier vendors ("ICVs").[2]
- The likely geographic market is the United States.
- This relevant market is highly concentrated; as a result, Syniverse likely has market power.
- There appear to be substantial barriers to entry into the ICV business.
- There are network effects in the relevant market.
- tyntec is an actual competitive threat to other ICVs.
- Discontinuation of Syniverse's peering agreement with tyntec would harm Syniverse's customers.
- Syniverse's discontinuation of its peering agreement with tyntec is contrary to the

---

[1] For example, as part of my analysis, I interviewed Thorsten Trapp, tytnec's Co-Founder and Chief Technology Officer.

[2] "SMS" means "short message service;" an SMS is a standard text message. MMS or "multimedia messaging service" involves the transmission of pictures, video, and audio. Declaration of Nicola Wolfram in Support of Plaintiffs' Motion for Preliminary Injunction ("Wolfram Declaration"), ¶10.

long history of peering in the industry.

- Syniverse's actions only make sense as a means to achieve anticompetitive ends.

Should additional information become available, I may update or revise these conclusions.

## IV. INDUSTRY BACKGROUND

8. More than fifteen years ago telecommunications carriers decided that subscribers of one carrier should be able to communicate through text message (both through SMS and more recently through MMS) with subscribers of other carriers.[3] However, creating an interconnected system to send messages between telecommunication carriers presented both technological and cost obstacles.[4] To overcome these obstacles, ICVs "emerged to develop and operate ICV services for the benefit of their telecommunications customers."[5] ICVs "transport messaging traffic between telecommunications carriers, which enables the text messages and other communications sent by a subscriber of one carrier (e.g., a T-Mobile subscriber) to reach a subscriber of another carrier (e.g., a Verizon subscriber)."[6]

9. There are currently more than 85 wireless carriers operating in the Unites States and Canada.[7] ICVs contract with different telecommunications carriers and then exchange ICV services between each other.[8] This arrangement allows Verizon, for example, to maintain a single contract with an ICV instead of contracting separately with each of the other 84 wireless carriers.

10. **Exhibit 1** illustrates a stylized representation of the SMS/MMS transfer

---

[3] Wolfram Declaration, ¶¶9-10.

[4] *Id.* at ¶10.

[5] *Id.* at ¶11.

[6] *Id.* at ¶6.

[7] Complaint, *Tyntec Inc., et al. v. Syniverse Technologies, LLC* ("Complaint"), ¶27.

[8] *Id.* at ¶¶8-9.

industry with and without ICVs. As this exhibit shows, direct connecting between each wireless carrier would require substantially more contractual relationships. Partnering through the ICV network however, streamlines and simplifies SMS/MMS interconnectivity by enabling each carrier to maintain only a single relationship with its ICV provider.[9] (Notably, this is a substantially simplified diagram, as there are many more carriers in the U.S., each of which would require a separate connection to every other carrier.)

**EXHIBIT 1**
**ILLUSTRATIVE INDUSTRY STRUCTURES WITH AND WITHOUT ICVS**




11. The formal agreements that govern the interconnectivity between the ICVs are known as "Peering Agreements" (and are reflected by the dashed line between the ICVs in the right panel of **Exhibit 1**). These Peering Agreements enable the transmission of messages across carrier networks.[10]

12. I understand that over the last several years, this industry has consolidated through various acquisitions, such that there are currently only three ICVs left in the United

[9] ICVs solve the "technological and costs issues" for SMS/MMS interconnectivity. Wolfram Declaration, ¶10.
[10] Complaint, ¶¶8-9.

States: Syniverse, SAP, and tyntec.[11] tyntec alleges that Syniverse has further expanded its share of the ICV market by foreclosing competitors using various tactics.[12]

13. Finally, I understand that in the ICV industry, the standard billing and settlement model is "bill and keep," whereby ICVs bill their own customers for services and keep the revenue earned by providing their services, with no settlement taking place between the ICVs themselves.[13] I understand that Syniverse seeks to break from the long standing "bill and keep" model by requiring tyntec to pay per message fees that "are comparable to or that exceed the fees that Syniverse charges its telecommunications carrier customers for messaging traffic."[14] According to Nicola Wolfram, Chief Executive Officer of tyntec Group Ltd., "*any* per-message fee" would "make it impossible for tyntec to remain competitive in the U.S. ICV market."[15]

## V. Analysis of Market Power

### A. Antitrust Market Definition

14. In antitrust, the purpose of market definition is to "provide a context within which competitive effects can be analyzed."[16] Generally, the purpose of defining a relevant market is to help assess market power. With a properly defined relevant product and geographic antitrust market, it is possible to calculate market shares and concentration ratios that can give an indication of a market participant's ability to exercise market power. While

[11] *Id.* at ¶¶36-44. For example, Syniverse acquired VeriSign in 2009 for $175 million and MACH—an entity providing a similar service in Europe—in 2013 for 550 million Euros. (See https://goo.gl/GZ1exo and https://www.syniverse.com/news-releases/mach_close, Accessed March 19, 2017)

[12] Complaint, ¶¶75-82.

[13] *See, e.g.*, CTIA, *Inter-Carrier MMS Messaging Guidelines*, October 21, 2004. (Available at https://goo.gl/OGHsg4, Accessed March 19, 2017.) See also, Wolfram Declaration, ¶13.

[14] Complaint, ¶15.

[15] Wolfram Declaration, ¶30.

[16] ABA Section of Antitrust Law, *Market Definition in Antitrust: Theory and Case Studies* (2012), p. 1.

high levels of concentration are not direct evidence of market power, there is a general presumption that increased concentration can increase market power.[17] The fewer the competitive substitutes available, the greater the potential for a firm to exercise market power.

15. The relevant antitrust market definition is based on the demand-side alternatives available to consumers, i.e., the products that consumers could turn to in place of the product in question in response to a price increase.[18] In the context of the relevant product market, this is based on other products that consumers might turn to; in the context of the relevant geographic market, it is based on the suppliers of a particular product that a consumer in a given region could switch to.[19]

### 1. Product market definition

#### (a) No substitutes for carrying of SMS/MMS messages between wireless carriers

16. Based on my analysis to date, the relevant product market in the present case is the transmission of text messages and multimedia messages between different wireless carriers. My understanding is that in the United States, this market is exclusively, or nearly exclusively served by ICVs.[20] The customers of ICV services are wireless carriers that use services offered by these companies to transfer messages between their own customers and the customers of other carriers.

---

[17] See, e.g., U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines (2010), ("Merger Guidelines"), § 2.1.3. "Mergers that cause a significant increase in concentration and result in highly concentrated markets are presumed to be likely to enhance market power."

[18] *Id* at, p. 7.

[19] Market definition is not the only way to analyze market power, however. The assessment of a firm's market power and how its market power may harm competition can sometimes be observed directly. In such instances, the definition of a relevant market may not be necessary or useful. Merger Guidelines, § 2.1 ("Types of Evidence") and § 4.0 "The Agencies' analysis need not start with market definition. Some of the analytical tools used by the Agencies to assess competitive effects do not rely on market definition, although evaluation of competitive alternatives available to customers is always necessary at some point in the analysis." For example, to the extent Syniverse is able to foreclose actual or potential competition by unilaterally changing the terms of peering agreements is direct evidence of the ability to exert market power.

[20] Interview with Thorsten Trapp, March 17, 2017 ("Trapp Interview").

17. As customers of ICV services, the wireless carriers have no apparent immediate alternative sources of supply for inter-carrier text message and multimedia message transmission. My understanding is that the United States wireless telecommunications industry has evolved such that the carriers do not connect directly with each other due to concerns over cost and complexity.[21] In particular, direct connection between wireless carriers would require a diversion of their resources to contract with a large numbers of carriers. My understanding is that as a result, the historical practice has been that carriers partner with a single ICV for the routing of the inter-carrier messages originating and terminating on their networks.[22]

### 2. Geographic market definition

18. Based on my analysis to date, the geographic market is limited to the United States. While my understanding is that there are providers of ICV services outside of the U.S., none appear to compete in any significant way for U.S. carriers. It is therefore likely that ICVs outside the U.S. do not have the requisite experience or infrastructure to carry the larger volume of messages required in the United States. Additionally, the CTIA Wireless Association's SMS Interoperability Guidelines "General Recommendations" apply to "regular 10-digit dialable telephone numbers included in the North American Numbering Plan," which serves the United States.[23]

19. The fact that no firms from outside the U.S. have a material presence in this

---

[21] Wolfram Declaration, ¶10. "[T]he carriers learned that achieving SMS and MMS interconnectivity presented serious technological and cost issues."

[22] All but one of the largest "Tier 1" wireless carriers obtain their ICV services from Syniverse. Declaration of Thorsten Trapp in Support of Plaintiffs' Motion for Preliminary Injunction ("Trapp Declaration"), ¶11. Wireless carriers could theoretically provide inter-carrier messaging, but have not done so for the reasons given. Even if they were to do so, however, this would not change the relevant product market, as the wireless carriers would simply be providing the same services as the ICVs. Direct contracting should therefore be viewed, at best, as potential entry into the provision of inter-carrier messaging.

[23] CTIA, *SMS Interoperability Guidelines*, February 5, 2013. (Available at https://goo.gl/yjEA6Y, Accessed March 18, 2017), pp. 11-12.

market—and (as is my understanding) have no history of entry (outside of acquiring a firm in the U.S.)[24]—is an indication that the above factors prevent U.S. based carriers from using non-domestic ICVs for their domestic traffic. As such, the relevant geographic market for ICV services for U.S. carriers is likely limited to the U.S.

### B. Market Shares

20. It is my understanding that because discovery has not yet begun, no direct information on ICV market shares has yet been made part of the record. However, it may be possible to approximate these market shares using subscribership numbers from the ICVs' customers—the wireless carriers in the U.S.[25] In his declaration, Thorsten Trapp presents shares of wireless subscriptions by carrier as a "proxy for the amount of traffic on each ICV's hub."[26] **Exhibit 2** shows the percent of wireless subscriptions whose SMS ICV services are provided by Syniverse and SAP. As this table illustrates, the wireless carrier market, and by extension the ICV market, is highly concentrated, and Syniverse likely has market power.

---

[24] Trapp Interview.

[25] Assuming balanced traffic flows across wireless carriers.

[26] Trapp Declaration, ¶10.

**EXHIBIT 2**
**WIRELESS SUBSCRIBERSHIP IN THE UNITED STATES**
**BY CARRIER AND SMS INTER-CARRIER PROVIDER**
**3RD QUARTER 2016**

| Inter-Carrier Vendor | Wireless Carrier | Percent of U.S. Subscribers |
|---|---|---|
| [a] | [b] | [c] |
| Syniverse | AT&T | 32.38% |
| Syniverse | T-Mobile | 16.84% |
| Syniverse | Sprint | 14.38% |
| Syniverse | US-Cellular | 1.22% |
| | **Syniverse Total:** | **64.82%** |
| SAP | Verizon | 34.94% |
| | **SAP Total:** | **34.94%** |

Sources: Trapp Declaration, ¶¶12-14.

21. The percentage attributed in this table to Syniverse subscribers likely understates Syniverse's actual share of the ICV market because Syniverse also handles MMS services for Verizon, and therefore accounts for 98% of MMS service subscribers.[27] Accordingly, Mr. Trapp has estimated that Syniverse's share of the ICV market likely is closer to 70% or more.[28]

## C. Barriers to Entry

22. There appear to be substantial barriers to entry into the ICV business. First, I understand that an ICV must have a proven track record of its ability to handle the SMS/MMS traffic in the United States in order to attract customers (wireless carriers).[29] Second, there are substantial technological barriers to entry. For example, a new entrant would need to develop

[27] Trapp Declaration, ¶¶15-16.

[28] *Id* at ¶17.

[29] Trapp Interview.

the requisite technological platform, which can take an extended period of time.[30] Finally, and critically, in order to allow its customers to send and receive messages with all carriers, a new ICV must establish peering agreements with other ICVs.[31] This market structure enables incumbent ICVs to potentially act as gatekeepers, effectively foreclosing any entry by not establishing peering agreements with a new entrant.[32]

## VI. POTENTIAL FOR HARM TO CONSUMER WELFARE FROM THE ALLEGED CONDUCT

### A. Network Effects in the Relevant Market

23. Industries characterized by network effects are often viewed as particularly susceptible to anticompetitive conduct.[33] A defining trait of networks is that the value of the product to any given customer increases as more people use the product.[34] This fact, combined with significant scale economies (i.e., declining unit costs as quantity produced increases), can create situations where a single firm may evolve to dominate a market and offset the social gains.[35]

24. The telecommunications industry is frequently viewed as a "classic" example of a network industry because the more people that have a phone, the more valuable it is to each individual user because that user can reach increasingly more people. In fact, in their textbook on industrial organization, professors Carlton and Perloff cite to the "widespread

---

[30] According to Thorsten Trapp technology development can take one to one and a half years. Trapp Interview.

[31] Trapp Interview.

[32] It is possible that an ICV in another country, which has already developed the technology to compete in the United States, could use its prior experience to compete for existing wireless customers in the United States. However, for these entities to service US based wireless carriers they would still need to establish peering agreements with the incumbent ICVs. It is my understanding that aside from acquisitions, there has not been any entry into the U.S. market by foreign ICVs. Trapp Interview.

[33] Carlton, Dennis W. and Jeffery M. Perloff, *Modern Industrial Organization*, 4th Edition, 2005 ("Carlton & Perloff"), p. 391.

[34] *Id.* at 391.

[35] *Id.* at 391-92.

consolidation" in the telecommunication industry as an example of the type of dominance that can result in network industries.[36]

25. The ICV market is also part of a broader network effect, namely because the more people that use text and multimedia messaging, the more valuable the service becomes to each person. That is, the value to any individual increases, the more people that individual can send messages to. The wireless telecom industry recognizes this benefit of granting users universal access to other subscribers, as is outlined in the CTIA Wireless Association Interoperability Guidelines.[37] As backbone providers of this service between carriers, ICVs are a critical component of the telecom network.

26. Potential anticompetitive effects can arise, however, when a single firm can emerge to dominate a network market. Such a threat was recognized in a similar context as a potential outcome of the merger between WorldCom and MCI, which were the two largest providers of internet backbone service. As a combined entity, it "would need to interconnect with other networks less than those networks would need to interconnect with it.[38] This could have enabled the combined entity to restrict shared access with smaller rivals. As a result, without being able to gain access to a large portion of the network's users, service offered by other firms would be rendered nearly worthless.

27. The same threat exists with ICVs. By taking advantage of this network effect, Syniverse can enhance its market power and exercise its market power to exclude competition.

---

[36] *Id.* at 391.

[37] *See* CTIA, *SMS Interoperability Guidelines*, p. 4. For example, "[a]t the first inter-carrier messaging meeting in Las Vegas on October, 25th 2001 all participating carriers indicated their intent to support inter-carrier messaging. This service enables wireless subscribers to send and receive messages using their phone number (MSISDN/MIN) to and from any wireless network." Other versions of these guidelines reinforced this point.

[38] A. Douglas Melamed, N*etwork Industries and Antitrust*, Speech given before the Federalist Society. April 10, 1999. (Available at https://goo.gl/P34XLq, Accessed March 19, 2017)

For example, to the extent a single firm, such as Syniverse, dominates the market, that firm has less of a need to honor its peering agreements as compared to smaller rivals, such as tyntec. By failing to honor such an agreement, Syniverse harms its own customers, as they would not have access to tyntec's customers, but this is a relatively small portion of the overall network and therefore not as harmful to Syniverse as it is to tyntec. In contrast, tyntec loses access to the majority of the market, rendering its service largely worthless.

### B. tyntec is an Actual Competitive Threat to Other ICVs

28. The evidence I have reviewed to date indicates that tyntec, despite its relatively small share of the ICV market, is a threat to Syniverse's business. As a result, it could affect Syniverse pricing and restrict its ability to exercise market power.

29. First, according to Nicola Wolfram's declaration, "tyntec has invested millions of dollars in its ICV services business, keeping the assets it acquired from Iris Wireless functioning in order to maintain, preserve and enhance the presence of a third 'hub' in the U.S. ICV services market."[39] Therefore, tyntec can, with reasonable lead time, compete for the same set of domestic customers as Syniverse.

30. Additionally, tyntec has recently signed contracts to provide ICV services to more than twenty wireless carriers affiliated with a telecommunications company as well as two additional telecommunication companies Shell Communications ("ShellCom") and Flyp, Inc. ("Flyp").[40] According to Nicola Wolfram, several other telecommunications carriers are in the process of negotiating contracts with tyntec.[41]

## VII. SYNIVERSE'S ALLEGED CONDUCT IS INCONSISTENT WITH ITS UNILATERAL SELF-INTEREST BUT-FOR ITS ANTICOMPETITIVE EFFECT

---

[39] Wolfram Declaration, ¶17.

[40] *Id.* at ¶¶43-47.

[41] *Id.* at ¶49.

**A. Discontinuation of its Peering Agreement with tyntec would Harm Syniverse's Customers**

31. As I discuss above, the wireless telecom and ICV markets have strong network effects. Any action by Syniverse to end its peering relationship with tyntec would directly lower the value of Syniverse's own service and harm Syniverse customers (as well as the wireless subscribers served by its customers). The access that Syniverse customers have to tyntec customers would be broken by the discontinuation of the agreement, decreasing the overall value of the service.

**B. Syniverse's Discontinuation of its Peering Agreement with tyntec is Contrary to the Long History of Peering in the Industry**

32. Syniverse's December 14, 2016 notification not to renew its peering agreement with tyntec[42] is at odds with the long standing course of dealing within the industry. The ICVs have engaged in peering relationships without charging one another at least as far back as 2004.[43] By allowing the peering arrangements, ICVs met the demands of the wireless carriers (as outlined in the CTIA Wireless Association guidelines), and improved the overall value of the ICV product. This practice remained in place continuously between all parties until the recent conduct by Syniverse, and remains in place between Syniverse and SAP, as well as SAP and tyntec.[44] I am aware of no sudden change in the industry structure, or any of the firms' business practices, that warrant, for cost or efficiency reasons, the recent actions by Syniverse. In fact, Syniverse's behavior appears to be more consistent with the opportunity to exert market power due to a sufficient relative size advantage over tyntec, than it does due to other,

---

[42] Wolfram Declaration, ¶26.

[43] *Id.* at ¶ 18.

[44] I am not aware of any potential differences between the peering arrangements of Syniverse and tyntec, and SAP and tyntec, that added costs to the former and precipitated ending the agreement, but enable the free peering agreement to continue between the latter.

pro-competitive justifications.

### C. Syniverse's Actions Therefore Only Make Sense As A Means To Achieve Anticompetitive Ends

33. Given the absence of any apparent efficiencies or cost savings, and the detrimental effects on Syniverse's own customers, the refusal to continue peering with tyntec without either firm charging the other only makes sense in the context of potential anticompetitive effects. This could come in the form of immediately capturing tyntec's customers, as well as the ability to increase prices (either immediately, or in the future as part of a recoupment strategy) due to Syniverse's greater share of the market and removal of an existing competitor. Syniverse's conduct, as alleged, has further concentrated an already highly concentrated market. With the significant barriers to entry that appear to exist, there is a heightened potential for price increases (or service decreases) in the future. These changes would be the direct result of increased market power and would come at the expense of consumer welfare.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 20th day of March, 2017.

Dr. Parker M. Normann

## APPENDIX A. CURRICULUM VITAE OF DR. PARKER M. NORMANN

Edgeworth Economics

1111 19th St, NW
Suite 200
Washington, DC 20036
202-559-4410
pnormann@edgewortheconomics.com

March 2017

**Parker M. Normann, Ph.D.**
**Partner**

Parker M. Normann has more than fifteen years' experience applying economic techniques to litigation, mergers, and regulatory matters for some of the world's largest and best known companies. Dr. Normann has extensive experience in presenting complex economic concepts to technical and non-technical audiences alike. He has been the lead economist in numerous high-profile merger and litigation cases, in which he provided expert consulting, analysis, expert testimony, and written reports.

Dr. Normann has worked on complex litigation and mergers in a variety of U.S. and Canadian industries, including pharmaceuticals, electronic data storage, paper product manufacturing, transportation, and agriculture. He has also worked on matters and prepared position papers for the banking and financial markets, real estate sector, major auditing firms, and the election and political markets.

Dr. Normann has presented analysis, testified, and submitted reports to U.S. courts, the U.S. Department of Justice, and Federal Trade Commission and has assisted with the preparation of analysis used in reports or evidence before the United States Congress, Federal and State courts, the Federal Trade Commission, the Department of Justice, and the Supreme Court of the United States.

Dr. Normann has also been recognized by the Global Competition Review, a leading industry publication, as a finalist for the Economist of the Year award and a winner of the Matter of the Year award for his work in the Seagate Samsung transaction.

Prior to joining Edgeworth Economics, Dr. Normann was a Vice-President with CapAnalysis. Early in his career, he assisted Dr. James C. Miller III (Former Director United States Office of Management and Budget, Chairman Federal Trade Commission) with his book, Monopoly Politics, and served as a research assistant at the Center for the Study of Public Choice at George Mason University.

## EDUCATION

George Mason University
Ph.D., Economics

Murray State University
MS, Economics

Lehigh University
BS, Economics, Marketing

## CURRENT EMPLOYMENT

Edgeworth Economics, Washington, D.C.
March 2011-present, Partner

## EMPLOYMENT HISTORY

CapAnalysis, Inc., Washington, D.C.
1998-2011, Vice- President, Senior Economist, Economist

Citizens for a Sound Economy Foundation, Washington, DC
1997–1998, Head of Research for *Monopoly Politics*

## PROFESSIONAL ACTIVITIES AND AWARDS

Global Competition Review Economist of the Year, Finalist 2012

Global Competition Review Matter of the Year Award, Winner 2011

American Bar Association, Associate Member
- Antitrust Section

American Economic Association, Member

## TESTIMONY AND EXPERT REPORTS

### LITIGATION

*In Re: Ductile Iron Pipe Fittings ("DIPF") Direct and Indirect Purchaser Litigation*
Expert report on class certification, liability, and damages. Direct Purchasers, July 29, 2016.
Expert report on class certification, liability, and damages. Indirect Purchasers, July 29, 2016.
Deposition, August 23, 2016.

*In Re: Suboxone Antitrust Litigation.*
Affidavit Regarding Downstream Discovery, January 27, 2016.

Confidential mediation hearing. Summer 2015.

*Apotex Inc. et al v. Acorda Therapeutics, Inc.*
Expert Report, April 30, 2014.
Deposition, June 23, 2014.

Confidential settlement analysis for antitrust litigation. 2013

*In the Matter of McWane, Inc., Before the Federal Trade Commission Office of Administrative Law Judges*
Testifying expert in Section V case regarding allegations of horizontal agreement and monopolization.
Expert Report, June 29, 2012.
Deposition, July 23, 2012.
Testimony at ALJ Trial, October-November 2012.

*E.I. du Pont de Nemours and Company v. Kolon Industries, Inc.* 2011
Expert declaration in support of motion to compel.

*Federal Trade Commission Non-Public Investigation*
Presented economic analysis before the Office of Commissioner Rosch, June 29, 2011
Presented economic analysis before the Office of Commissioner Ramirez, June 30, 2011
Presented economic analysis before the Office of Commissioner Leibowitz July 7, 2011
Presented economic analysis before the Office of Commissioner Kovacic July 8, 2011

*Wheeler et al. v. Pilgrim's Pride Corp., Eastern District of Texas.* 2007
Expert declaration on data management.

*D. Lamar Deloach v. Philip Morris Companies.* 2003.
Expert declaration for valuation of Tobacco Growers settlement.

*D. Lamar Deloach v. Philip Morris Companies.* 2003.
Reply declaration for valuation of Tobacco Growers settlement.

## MERGERS & ACQUISITIONS

Seagate acquisition of Samsung HDD business.
Served as lead economist for Samsung before the Federal Trade Commission.

Cenveo Acquisition of MeadWestvaco Envelope Product Group.
Served as lead economist for analysis and presentation before U.S. Department of Justice.

Saskatchewan Wheat Pool/ Agricore United.
Served as lead economics for economic analysis and presentation before U.S. Department of Justice.

Tyson Foods acquisition of IBP.
Lead economist for market definition issues before the U.S. Department of Justice.

## REGULATION

*In the Matter of SR-Phlx-2013-113 to the United States Securities and Exchange Commission*
Statement Letter to the SEC, May 8, 2014.

## SELECTED CONSULTING EXPERIENCE

### LITIGATION

*Wallach, et al., v. Eaton Corporation, et al.* Lead consulting economist in direct class action regarding heavy duty transmissions.

*In Re Class 8 Transmission Indirect Purchaser Antitrust Litigation.* Lead consulting economist in indirect class action regarding heavy duty transmissions.

*In re Nexium Antitrust Litigation.* Lead consulting economist for Nexium in the class and damages phases of the litigation.

*NYC Bus Tour Antitrust Litigation.* Lead consulting economist in a class action case regarding claims of anticompetitive conduct.

*In Re Wellbutrin XL Antitrust Litigation*. Served as lead internal economist for direct and indirect damage calculations.

*In re: Wholesale Grocery Products Antitrust Litigation*. Prepared analysis on market definition and market power on class wide impact.

*Arminak & Associates, Inc. v. MeadWestvaco Calmar, Inc.* Served as lead internal economist for manufacturer of trigger sprayers accused of violating federal and state antitrust laws, through alleged exclusive dealing contracts and below-cost pricing.

*Advanced Micro Devices (AMD) v. Intel*. Served as lead internal economist for antitrust evaluation of Intel/IBM contracts.

*K-Dur Civil Antitrust Litigation*. Served as lead internal economist for class and liability analysis on behalf of Schering-Plough.

*In the matter of the FTC v Schering Plough Corporation*. Constructed and analyzed financial models for projected drug sales.

*In the matter of the FTC v Boston Scientific Corporation*. Served as lead internal economist for attempted monopolization claims relating to medical devices.

Publication Paper Antitrust Litigation. Provided consulting for outside experts regarding class certification.

*Ford Motor Company Litigation*. Researched economic implications for international pricing.

*DeLoach v. R.J. Reynolds* . Served as lead internal economist for class certification and liability in litigation involving collusion in auction system.

*Guadalupe Garcia v United States Department of Agriculture*. Provided expert advice regarding class merits.

Master Settlement Agreement. Provided consulting for confidential client regarding pricing implications from government's master settlement agreement.

*Intergraph v. Intel.* Prepared economic analysis of Intergraph claim of exclusive conduct and attempted monopolization regarding microprocessor patent.

Electronics for Imaging. Prepared analysis of photo-editing software market.

## MERGERS & ACQUISITIONS

*MeadWestvaco/RockTenn merger.* Lead economist representing MeadWestvaco in $16 billion combination with RockTenn. Prepared analysis for filings before agencies in the U.S., Canada, Mexico, and India.

Seagate/Samsung HDD business. *Global Competition Review Matter of the Year.* Lead economist representing Samsung in sale of global hard disk drive business.

Nestle/ Kraft Foods' frozen pizza. Prepared empirical "Staples" and entry event studies to determine extent of price competition for relevant products.

Dow Corning acquisition of Globe Specialty Metals assets in U.S. and Brazil. Served as lead internal economist for analysis of competitive effects of $175 million dollar transaction.

Mead/Westvaco. Served as lead economist for multibillion dollar merger of two of the world's largest paper producers.

Mead/ Day Runner. Served as lead economist for acquisition of Day Planner.

Mead/At-A-Glance—Paper and office products. Served as lead economist for acquisition of At-A-Glance.

Confidential paper/paperboard industry project. Provided consulting for numerous potential acquisitions.

Ingram Barge/ Midland. Served as lead economist for Ingram Barge acquisition of Midland Enterprises LLC.

Ingram Barge/ Riverway Company. Served as lead economist for Ingram Barge acquisition of Riverway assets.

US Airways/Delta. Provided expert consulting for investors studying antitrust implications.

Cargill/Continental. Analyzed likely impact on pricing and distribution resulting from the proposed merger.

## REGULATION

Financial markets, accounting. Provided expert advice regarding merger environment.

FHLMC Freddie MAC—Financial markets, mortgage backed securities. Prepared economic impact analysis of proposed rulemaking regarding mortgage-backed securities.

New York ISO—Financial markets, energy trading. Assisted with analysis and market monitoring of New York wholesale energy market.

National Association of Realtors. Prepared economic impact analysis of proposed rulemaking regarding bank cross-over into real estate markets.

Regulatory rule proposal. Prepared economic impact analysis of proposed rulemaking regarding Treasury bond repurchase market.

## PUBLICATIONS AND PRESENTATIONS

Omicron Delta Epsilon annual dinner, Murray State University, Key Note Speaker. April, 2016.

“Reflections on Bazaarvoice” (with Gregory K. Leonard), CPI Antitrust Chronicle. March 2014.

“The Use and Misuse of Regression Analysis in Antitrust Litigation” (with Laila Haider), Seminar at White & Case, LLP (for CLE credit). 2013.

“The Working Relationship on Class Certification,” Baker Botts. 2013.

“Working with Economic Experts – Econometrics,” White and Case (for CLE credit). 2013.

“Market Definition Does Not Yield Evidence of Class-Wide Impact,” The Antitrust Practitioner. Volume 9, June 2012 (with Michael Noel).

“ABA Rule of Reason Handbook”, contributing author (forthcoming).

“Economics of Antitrust,” Howrey Antitrust Fundamentals Seminar (for CLE credit). 2011.

“Managing Testifying Experts Presentation,” Howrey U. 2010 (with Chuck Loughlin).

"More of the Same: Continued Growth In Private Antitrust Litigation And Continued Cut-Backs By The US Supreme Court." *Global Competition Review: Antitrust Review of the Americas 2009*, September 2008 (with Joseph Ostoyich and David T. Emanuelson).

## APPENDIX B. MATERIALS RELIED UPON

**<u>Court Filings</u>**

Complaint, *Tyntec Inc., et al. v. Syniverse Technologies, LLC* .

**<u>Testimony Transcripts</u>**

Declaration of Nicola Wolfram in Support of Plaintiffs' Motion for Preliminary Injunction.

Declaration of Thorsten Trapp in Support of Plaintiffs' Motion for Preliminary Injunction.

**<u>Interviews</u>**

Interview with Thorsten Trapp, March 17, 2017

**<u>Articles, Books, and Websites</u>**

A. Douglass Melamed, N*etwork Industries and Antitrust*, Speech given before the Federalist Society. April 10, 1999, https://goo.gl/P34XLq.

ABA Section of Antitrust Law, *Market Definition in Antitrust: Theory and Case Studies* (2012).

Carlton, Dennis W. and Jeffery M. Perloff, *Modern Industrial Organization*, 4th Edition, 2005.

CTIA, *Inter-Carrier MMS Messaging Guidelines*, October 21, 2004, https://goo.gl/OGHsg4.

CTIA, *SMS Interoperability Guidelines*, February 5, 2013, https://goo.gl/yjEA6Y.

"Syniverse Completes Acquisition of MACH," July 1, 2013, https://www.syniverse.com/news-releases/mach_close.

"Syniverse to Acquire Verisign's Messaging Business," August 25, 2009, https://goo.gl/GZ1exo.

U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines (2010).