UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TYNTEC INC., and TYNTEC GROUP LTD.,

   Plaintiffs,

v.                                                                                     CASE NO.  8:17-cv-591-T-26MAP

SYNIVERSE TECHNOLOGIES, LLC,

   Defendant.
_____/

# O R D E R

**BEFORE THE COURT** is Syniverse Technologies, LLC's Motion to Dismiss the Amended Complaint under Federal Rule 12(b)(6) (Dkt. 65), Plaintiffs' Memorandum of Law in Opposition (Dkt. 73), and Defendant's Reply (Dkt. 74).  After careful consideration of the allegations of the Amended Complaint (Dkt. 42), the applicable law, and the entire file, the Court concludes the motion should be denied.

## ALLEGATIONS

### *Background*

In the First Amended Complaint, tyntec alleges (1) monopolization, specifically refusal to deal, under section 2 of Title 15 of the United States Code, (2) attempted

monopolization under 15 U.S.C. § 2, (3) common law tortious interference with contract, and (4) common law tortious interference with business relations. The amended complaint alleges that Syniverse Technologies, LLC (Syniverse), is a monopolist in the U.S. inter-carrier vendor (ICV) market. tyntec is also an ICV as is only one other company, SAP.[1] An ICV facilitates the delivery of text or short messages (SMS messages) and multimedia messages (MMS messages) from the subscribers of one wireless telecommunications carrier's network to the subscribers of another wireless telecommunications carrier's network. In other words, the ICVs allow interoperability for cell phone users to communicate between their provider and their recipients' provider such as Verizon and AT&T. The ICV uses "its own facilities as an intermediary to 'bridge the gap' between the two networks for delivery of messages."[2] The SMS and MMS message traffic predominantly occurs between individual wireless telecommunications customers.

---

[1] SAP is not a part of this lawsuit. A company named Iris Wireless used to be an ICV, but according to Syniverse, it did not renew the peering agreement with Iris because Iris' "only real customers were not companies that were licensed wireless telecommunications carriers but companies that traffic in SMS-IP messages." See docket 52-1, paragraph 30. Because SMS-IP companies deliver texts over the Internet, Syniverse charges a transit fee when routing their traffic to Syniverse's wireless telecommunications carrier customers. Id.

[2] See docket 52-1, paragraph 10 (declaration of John McRae, Group Vice President and General Manager of Syniverse).

According to the amended complaint, Syniverse enjoys a 70% market share in the U.S. ICV market.[3]  This is uncontested by Syniverse.  tyntec alleges "a dangerous possibility" for Syniverse to acquire monopoly power because there are high barriers to entry into the market and Syniverse is presently using its power to exclude tyntec by "increasing tyntec's peering costs to anti-competitive levels."[4]  ICVs interconnect with other ICVs through peering agreements.  The peering agreements "make it easier for subscribers to send SMS and MMS messages," thereby making texting popular.  Syniverse and its predecessors and tyntec and its predecessors have operated under peering agreements for thirteen years.[5]  Syniverse, however, has never directly entered into a peering agreement with tyntec.  In June 2016, Iris Wireless, a former ICV, assigned to tyntec all of its assets, including peering agreements entered into with Syniverse in April 2015, and its existing business.[6]  The amended complaint alleges that "[b]y eliminating one of its few remaining competitors (both then and now) [Iris Wireless and tyntec], Syniverse is plotting to raise prices to telecommunications carriers who will have no choice but to pay them."[7]

---

[3]  See docket 42, paragraphs 2 and 31.

[4]  See docket 42, paragraph 104(c).

[5]  See docket 42, paragraph 4.

[6]  See docket 42, paragraphs 18, 21, 48 and 60.  A peering agreement between Iris Wireless and SAP was also acquired by tyntec.  See docket 42, paragraph 48.

[7]  See docket 42, paragraph 15.

The peering agreements at issue are the MMS Interworking Services Agreement Between Syniverse and Iris Wireless, and the Wireless Peer-to-Peer Messaging Peering Services Agreement Between Syniverse and Iris Wireless, both dated April 7, 2015.[8] The parties do not directly charge each other for carrying each other's messaging traffic, but rather pass the charges on to the telecommunications carriers for providing the interconnectivity.[9] This billing arrangement is referred to as "bill and keep," which has been the business model employed between Syniverse and its predecessors and tyntec and its predecessors for more than twelve years.[10] The peering agreements provide for an initial two-year term with the option for one-year renewals.[11] Either party may choose to not renew with 90 days' written notice.

***Antitrust Violations***

---

[8] See docket 42, paragraph 60. tyntec does not attach the agreements to the amended complaint, but Syniverse attaches them to its response. See docket 65-1 and docket 65-2.

[9] See docket 42, paragraph 61.

[10] See docket 42, paragraphs 37, 38, 51 and 62.

[11] See docket 65-1, P2P Agreement, § 10.1; and docket 65-2, MMS Agreement, § 10.1. ("This Agreement shall commence on the Effective Date and shall continue in full force and effect for two (2) years from the Effective Date (the "Initial Term"). This Agreement shall automatically be renewed for successive one (1) year terms (each a "Renewal Term") unless and until any Party gives the other Parties ninety (90) days' prior written notice prior to the end of the Initial Term or the applicable Renewal Term of its intent to terminate this Agreement as of the end of such Term.").

On November 10, 2016, Syniverse conveyed its intent not to renew its peering agreement with tyntec, which terminated on April 7, 2017, just two days after the amended complaint was filed.[12] tyntec alleges that despite the "long-standing, customary and mutually advantageous course of dealing, and without any legitimate pro-competitive justification," Syniverse intended to terminate the peering agreements without knowing the volume of traffic tyntec planned to send Syniverse's telecommunications customers.[13] The letter of November 10 expresses Syniverse's skepticism concerning the validity of the assignment of the peering agreements from Iris Wireless to tyntec; however, Syniverse decided to honor the peering agreements through April 7, 2017 – its termination date. On December 14, 2016, Syniverse sent notice to terminate effective April 7, in compliance with the peering agreements.[14]

The amended complaint alleges that Syniverse refused to deal with tyntec on the traditional "bill and keep" or "no-fee" terms and, instead, sought to impose a restructuring of the agreement that would require tyntec to pay a per message fee, much like the charge Syniverse charges its telecommunication carrier customers.[15] According to tyntec,

---

[12] See docket 42, paragraph 5 and docket 65-3.

[13] See docket 42, paragraph 5.

[14] See docket 65-4.

[15] See docket 42, paragraph 6.

peering agreements always "involve a bill and keep revenue model whereby Syniverse and tyntec do not charge each other for carrying messaging traffic, but where Syniverse and tyntec generate revenue by billing their respective telecommunications carrier customers and keeping the proceeds."[16] Contrary to tyntec's inferences, there is no indication from the peering agreement itself that the "bill and keep" or "no-fee" terms automatically apply to all peering agreements between ICVs.[17] The allegations focus on the course of dealing between Syniverse and tyntec's predecessors.

tyntec characterizes the new terms of the proposed peering agreement set forth in the November 10th letter as evidence of a "predatory act that will exclude tyntec from the U.S. ICV market."[18] The letter stated that the new agreement would be a "standard message aggregator agreement" which would provide tyntec access to Syniverse's network by paying per-message and other fees for carrying tyntec's message traffic.[19] Additional evidence of Syniverse's anti-competitive intent was revealed in the negotiations of the new terms, according to tyntec.

---

[16] See docket 42, paragraph 51.

[17] See docket 52-1, paragraph 28 (2015 peering agreement between Iris and Syniverse).

[18] See docket 42, paragraph 7.

[19] See docket 42, paragraph 63 and docket 65-4.

On January 27, 2017, Syniverse met with tyntec in Tampa.[20] According to tyntec, Syniverse officials told them at this meeting that Syniverse was terminating the agreement because it did not want tyntec to remain a competitor in the U.S. ICV market.[21] The amended complaint alleges that Syniverse possessed the specific intent to "unilaterally terminate a voluntary, beneficial, and profitable multi-year course of dealing in order to achieve an anti-competitive end – the destruction of tyntec – even at the risk of degrading Syniverse's own service in the short run by jettisoning its connectivity with tyntec and the subscribers that tyntec delivers."[22] The amended complaint further alleges that Syniverse's actions would "leave telecommunications carriers in the United States with only two ICVs to compete for their business – Syniverse and SAP. And, if Syniverse eliminates SAP, telecommunications carriers would be left with no choice at all – only Synverse. This would leave Syniverse with the unrestricted ability to raise prices in the long run."[23]

---

[20] See docket 42, paragraph 9.

[21] See docket 42, paragraphs 9, 73, and 104(b). Syniverse denied making this statement in the temporary restraining order proceedings. See docket 52-1, paragraphs 42-43.

[22] See docket 42, paragraph 69.

[23] See docket 42, paragraph 70; see also docket 42, paragraph 11. With respect to the customers' plight, "the ability of wireless customers to send and receive low-cost text messages depends upon the continued existence of the tyntec/Syniverse peering agreements." See docket 42, paragraph 12.

On March 10, 2017, Syniverse wrote that it would be willing "to continue to carry tyntec's traffic for tyntec's two existing customers (and no new customers)" if tyntec was willing to pay the traffic fees requested by Syniverse into escrow.[24] The parties disagree about whether this proposal constitutes a continuation or cessation of reasonable negotiations.

## LEGAL STANDARD

The amended complaint must allege "enough" facts, accepted as true and construed in the light most favorable to the plaintiff, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 1964-65, 1974, 167 L.Ed.2d 929 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 US. at 555, 127 S.Ct. at 1964-65 (internal citations omitted). Legal conclusions "couched" as facts need not be accepted as true. Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949. The conclusory legal allegations must first be separated out, and then "the remaining well-pleaded factual allegations" may be accepted as true and determined whether they state a plausible

---

[24] See docket 42, paragraph 9 and docket 52-7 (letter).

entitlement to relief.  Franklin v. Curry, 738 F.3d 1246, 1251 (11th Cir. 2013).

Determining whether the claim is plausible is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at

679, 129 S.Ct. at 1950.

Generally, only the four corners of the complaint may be considered in ruling on a

motion to dismiss pursuant to Rule 12(b)(6).  Cline v. Tolliver, 434 F. App'x 823, 824

(11th Cir. 2011) (unpublished opinion) (citing Speaker v. U.S. Dep't of Health and Human

Servs. Ctrs. for Disease Control and Prevention, 623 F. 3d 1371, 1379 (11th Cir. 2010)).

The court may consider exhibits if referenced in the complaint and attached to the

defendant's motion to dismiss.  Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116

F.3d 1364, 1369 (11th Cir. 1997).  The court may "consider an extrinsic document if it is

(1) central to the plaintiff's claim, and (2) its authenticity is not challenged."  SFM

Holdings, Ltd. v. Banc of Am. Secs., LLC, 600 F.3d 1334, 1337 (11th Cir. 2010).  The

Rule 12(b)(6) motion need not be converted into a Rule 56 summary judgment motion

"where certain documents and their contents are undisputed."  Speaker, 623 F. 3d at 1379.

## DISCUSSION

### *Count I – Monopolization/Refusal to Deal*

To establish monopolization under section 2 of the Sherman Antitrust Act, the

plaintiff must show that 1) the defendant possesses monopoly power in a relevant, defined

market and 2) the defendant willfully acquired or maintained that power as distinguished

from obtaining it through growth or development resulting from "a superior product, business acumen, or historic accident." Morris Commc'ns Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1293-94 (11th Cir. 2004) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)).  The power to exclude competition must be coupled with predatory or exclusionary acts to prevent or exclude competition in the relevant market.  Morris Commc'ns, Corp., 364 F.3d at 1294.[25]  It is not the harm to the *competitors* that matters but the harm to the competitive *process*, which in turn harms consumers.  Morris Commc'ns, Corp., 364 F.3d at 1294 (citations omitted).

### *The Relevant Market*

Before addressing monopoly power, a relevant product and geographic market must be defined.  Duty Free Americas, Inc. v. Estee Lauder Cos., 797 F.3d 1248, 1263 (11th Cir. 2015) (describing the relevant market as containing both geographic and product dimensions); Gulf States Reorganization Grp., Inc. v. Nucor Corp., 721 F.3d 1281, 1285 (11th Cir. 2013) (same).  The allegations describe the market as the U.S. ICV market, which hails only three competitors – Syniverse, SAP, and tyntec.  The U.S. market includes Canada.[26]  Neither party contests the geographical boundaries.

Syniverse challenges, however, tyntec's product definition of ICV services. Contrary to tyntec's allegations, Syniverse contends that ICV services are interchangeable

---

[25] Monopoly power also includes the power to control prices in the relevant market.  Id.

[26] See docket 42, paragraph 30.

because it is the wireless telecommunications carriers, rather than the ICVs, that drive the pricing. See Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523-24, 8 L.Ed.2d 510 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); see also U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 995 (11th Cir. 1993). As an example, Syniverse argues, SAP would take Syniverse's customers if Syniverse increased its prices above a competitive level because ICV services are interchangeable. For purposes of a motion to dismiss, however, the Court finds that tyntec's definition of the product market as ICV services is sufficient to withstand dismissal.[27]

*Monopoly Power*

Whether a particular market share may infer market power commensurate with that share depends on the facts of a particular case. See Duty Free Americas, 797 F.3d at 1264 (noting that determination of a relevant market is often fact-intensive question).

---

[27] At the heart of this claim is a disagreement between the parties as to whether tyntec is an ICV or a lesser entity that simply aggregates messages as opposed to acting like a "hub" transporting messages between telecommunications carriers. At this stage of the proceedings, tyntec alleges that it is an ICV, and Syniverse can point to no unequivocal, indisputable authority that can be applied to the pleadings and attachments to force this Court to make that determination now. The Court cannot take into consideration the testimony adduced at the hearing on the temporary restraining order concerning whether tyntec was a non-CMRS registered customer, which may provide justification for Syniverse changing the terms of the peering agreement to a standard message aggregator agreement.

Case law supports a finding that allegations of around a 70% market share may or may not be sufficient with respect to the percentage of market share. See Cobb Theatres III, LLC v. AMC Entertainment Holdings, Inc., 101 F.Supp.3d 1319, 1340-41 (N.D. Ga. 2015) (citing cases finding between 65% and 70% market share sufficient to show market power, but noting any inference from that percentage is always borderline); see also Bailey v. Allgas, Inc., 284 F.3d 1237, 1250 (11th Cir. 2002) (noting that more than 50% is necessary, and 70 or 75% may be sufficient).

Determining whether a precise percentage of market share translates to actual market power is generally, although not always, a question of fact. Market share does not in and of itself establish market or monopoly power. See Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1339-40 (11th Cir. 2010) (noting that more than market share must be alleged to survive a motion to dismiss); Fin-S Tech., LLC v. Surf Hardware Int'l-USA, Inc., No. 13-cv-80645, 2014 WL 12461350, at *3 (S.D. Fla. Sept. 3, 2014) (dismissing antitrust complaint and noting that "[w]hile market share is a measure of gauging monopoly power [in this case 60-70%], alone, it is not enough to establish a *prima facie* show of monopoly power."). In addition to an adequate market share, market power is often determined by the ease or difficulty of entering into the relevant market based on barriers. See Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 99 (2d Cir. 1998) (holding 72% market share insufficient to establish monopoly power because marketplace realities showed competitors easily gained market share). For example, a motion to

dismiss may be granted with prejudice if an antitrust complaint fails to allege any barriers to entry into the relevant market. See Fin-S Tech., LLC (dismissing with prejudice the antitrust complaint for failure to allege any barriers to entry to the surfboard fin market).

Syniverse claims that tyntec's allegation that there are "high barriers" to entry into the ICV market is conclusory and, as such, does not meet the Twombly-Iqbal standard. The alleged high barriers are "providing the technology necessary to create an ICV hub, signing agreements with telecommunications carriers, and entering into peer agreements with other U.S. ICVs."[28] In support of its position, Syniverse cites Lady Deborah's, Inc. v. VT Griffin Servs., Inc., No. CV-207-079, 2007 WL 4468672 (S.D. Ga. Oct. 26, 2007). In Lady Deborah's, Inc., the court granted a motion to dismiss antitrust claims for failure to properly allege the relevant market. There, the court found that allegations of a government contractor that defined the relevant market as cleaning services "to the United States Navy" was far too broad both as to product and geographical parameters. Lady Deborah's Inc., 2007 WL 4468672, at *9-10. The court discussed the necessity of considering barriers to entry such as historical chance or better business practices and, presumably, the complaint was devoid of any such allegations. The Court finds in this case, however, that the allegation listing the specific high barriers sufficient.

***Exclusionary Acts***

---

[28] See docket 42, paragraph 27.

Despite its thirteen-year course of dealing between Syniverse and tyntec's predecessors, tyntec alleges that Syniverse has committed the exclusionary acts of refusing to continue the peering agreement using the "bill and keep" model, and changing the arrangement to one in which tyntec pays Syniverse messaging fees as if it were a customer. The Court is well aware that tyntec itself did not actually land the Syniverse peering agreements at issue in this case until June 2016 through an assignment from Iris Wireless.[29] Nevertheless, according to the amended complaint, SAP still honors the peering agreement with tyntec through an assignment from Iris Wireless, and according to tyntec, Syniverse still honors its peering agreement with SAP.[30]

In addition to these allegations, tyntec, readily admitting it is the smallest competitor, alleges that it effectively competes "as a low-cost competitor with superior services and solutions, and it has contracted to add twenty or more wireless carriers accounting for approximately 170,000,000 messages per month."[31] As Syniverse points out, none of the cases suggest that future contracts unknown to the defendant, as opposed to the parties' current and past commercial relationship, should be considered in potential anti-trust behavior. Trinko, 540 U.S. at 409 (referring to the past "presumably profitable"

---

[29] See docket 42, paragraphs 18, 21, 48 and 60. The Court cannot consider the evidence adduced at the hearing on the temporary restraining order that Syniverse understandably questioned the terms of the assignment.

[30] See docket 42, paragraphs 53-55.

[31] See docket 42, paragraph 3.

course of dealing found in Aspen Skiing). The Court, however, finds that the allegations of exclusionary acts as a whole are sufficient to withstand dismissal.

Indeed, in a case which involved the very same peering agreement as here, a fellow judge of this District denied a motion to dismiss the complaint for refusal to deal. Iris Wireless LLC v. Syniverse Tech., 49 F.Supp.3d 1022 (M.D. Fla. 2014). In Iris Wireless, the court permitted the claims for monopolization and attempted monopolization to proceed on almost identical allegations as those alleged here, save the allegation that Syniverse held only "50% or more" of the market share. The Court finds for the same reasons as in Iris Wireless that the amended complaint alleges claims for relief for refusal and attempted refusal to deal.

***Valid Business Justification***

Regarding tyntec's allegations that Syniverse has no valid justification for refusing to deal, that Syniverse and tyntec are not "out of balance," and that tyntec is not "free-riding," the Court finds no fault.[32] A valid business justification on the part of the defendant is a defense to show that the defendant's actions may be seeking to prevent "free-riding" or to otherwise protect the furtherance of a legitimate business purpose, and is not required to be pleaded in a complaint. Cf. Morris Commc'ns, Inc., 364 F.3d at 1295 (finding that defendant met its burden of showing business justification based on evidence).

---

[32] See docket 42, paragraph 10.

*Antitrust Injury*

Syniverse argues that the amended complaint alleges injury only to tyntec's business rather than injury to competition. See Spanish Broadcasting Sys. of Fla., Inc. v. Clear Channel Commc'ns, 376 F.3d 1065, 1078-79 (11th Cir. 2004) (dismissing complaint that contained conclusory allegations of "current injury to competition" without specific factual allegations to support actual harm to competition). The amended complaint alleges that only two ICVs – Syniverse and SAP– will be left, and therefore "there will be no company in the U.S. ICV market that is focused on providing ICV services at low prices with superior service and solutions."[33] The result of tyntec's exclusion from the market will require telecommunications carriers to pay "increasingly higher prices to send text messages through Syniverse's ICV system."[34] The Court finds these allegations of harm to competition sufficient.[35]

## *Count II – Attempt to Monopolize/Refuse to Deal*

---

[33] See docket 42, paragraph 11.

[34] See docket 42, paragraph 11.

[35] Finally, Syniverse's position that it is simply exercising a contractual right to not renew the peering agreement is not a matter to decide at the motion to dismiss stage in view of tyntec's allegations of a course of dealing between the parties. Cf. DocMagic v. Ellie Mae, Inc., No. 3:09-cv-4017-MHP, 2011 WL 871480, at *2 (N.D. Cal. Mar, 11, 2011) (deciding on summary judgment that factual dispute existed with respect to renegotiation of contract in a case where plaintiffs denied defendant made an offer to negotiate).

Section 2 of the Sherman Antitrust Act forbids attempts to monopolize. 15 U.S.C. § 2. "The phrase 'attempt to monopolize' means the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it[.]" Nucor, 721 F.3d at 1285 (quoting Am Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 89 L.Ed. 1575 (1946)). Thus, the hallmarks of an attempt to monopolize are establishing a specific intent and a dangerous probability of success of monopolization. Nucor, 721 F.3d at 1285 (citing Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1555 (11th Cir. 1996)).

### ***Specific Intent***

The plaintiff is required to allege a specific intent to monopolize when pleading a claim for attempted monopolization under section 2. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); Morris Commc'ns Corp., 364 F.3d at 1293 n.10. The requisite specific intent may be shown by direct evidence or inferred from the defendant's conduct. U.S. Anchor, 7 F.3d at 1001 (noting that specific intent to achieve monopoly power may be inferred from the predatory conduct itself). Alleging predatory or exclusionary acts is sufficient to support an inference of the defendant's intent to monopolize. See City of Moundridge v. Exxon Mobile Corp., 471 F.Supp.2d 20, 43 (D.D.C. 2007) (finding insufficient allegations of specific intent based on sole conclusory statement that

"[d]efendants have . . . the specific intent of monopolizing the market" and absence of any allegations of predatory or exclusionary acts to support inference of specific intent).

The amended complaint alleges that in meetings between Syniverse's and tyntec's officials, Syniverse made it clear that it intended to oust tyntec from the U.S. ICV market so that tyntec would no longer be a competitor. Even in the event the evidence shows this statement untrue, tyntec alleges that Syniverse through its negotiations of the existing contract and through radical changes in the parties' course of dealing, intends to prevent tyntec from expanding its customer base and therefore drive down competition. The Court finds specific intent has been adequately pleaded.

### *Dangerous Probability of Obtaining Monopoly*

With two remaining ICVs – Syniverse and SAP – and the alleged significant barriers to new ICVs entering the market, tyntec has sufficiently pleaded a dangerous probability of successful monopolization on the part of Syniverse.

### *Forsaking Short-Term Profits*

Lastly, Syniverse argues that tyntec has failed to plead that Syniverse has sacrificed short-term profits by unilaterally deciding not to renew the peering agreements. See Trinko, 540 U.S. at 409. A unilateral termination of a voluntary course of dealing, however, may suggest a willingness to forsake short-term profits as in Aspen Skiing. There appears to be many factual disputes regarding the allegations of the amended

complaint, but a motion to dismiss cannot address matters requiring resolution of factual disputes.

### *Counts III and IV – State Common Law Tort Claims*

Without reiterating all of the reasons the Court finds it prudent to deny the motion to dismiss the federal antitrust claims, the Court also finds that the state claims state a cause of action under Florida law. Counts III and IV are not simply efforts to recast insufficient antitrust claims as state law torts.

It is therefore **ORDERED AND ADJUDGED** that Syniverse Technologies, LLC's Motion to Dismiss the Amended Complaint under Federal Rule 12(b)(6) (Dkt. 65) is **DENIED**. Defendant shall file its answer and defenses within ten (10) days.

**DONE AND ORDERED** at Tampa, Florida, on June 26, 2017.

    s/*Richard A. Lazzara*
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record