UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TYNTEC INC., a Delaware Corporation,
and TYNTEC GROUP LTD. f/k/a
Phoenix Spring Ltd., a United Kingdom
Corporation,

    Plaintiffs,

v.            Case No. 8:17-cv-591-T-23SPF

SYNIVERSE TECHNOLOGIES, LLC,
a Delaware Corporation,

    Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u>

  This is an antitrust action by Plaintiffs tyntec, Inc. and tyntec Group Ltd.'s (collectively "tyntec") against Defendant Syniverse Technologies, LLC ("Syniverse") alleging (1) monopolization, specifically refusal to deal, under § 2 of the Sherman Act, 15 U.S.C. § 2; (2) attempted monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2; (3) common law tortious interference with contract; and (4) common law tortious interference with business relations.  Doc. 42.  The parties have filed cross-motions for summary judgment (Docs. 116 & 119), statements of undisputed facts in support of their motions (Docs. 117 & 120), responses (Docs. 132 & 130), as well as statements of disputed facts in support of their responses (Docs. 134 & 131).  For the reasons that follow, it is recommended that tyntec's Motion for Summary Judgment (Doc. 116) be denied, and Syniverse's Motion for Summary Judgment (Doc. 119) be granted.

I.    **BACKGROUND**

The amended complaint alleges that Syniverse is a monopolist in the U.S. inter-carrier vendor ("ICV") market.  An ICV facilitates the delivery of text or short messages (SMS messages) and multimedia messages (MMS messages) from the subscribers of one wireless telecommunications carrier's network to the subscribers of another wireless telecommunications carrier's network.  In other words, the ICVs allow interoperability for cell phone users to communicate between their provider and their recipients' provider such as Verizon and AT&T.  The ICV uses its own facilities as an intermediary to "bridge the gap" between the two networks for delivery of messages.  Doc. 52-1 at ¶ 10.  There are three companies that sell ICV services in the U.S. ICV market: Syniverse, SAP, and tyntec.[1]  Doc. 42 at ¶ 2.

ICVs have two types of customers: (1) telecommunication companies that hold Commercial Mobile Radio Service ("CMRS") licenses issued by the FCC, and (2) telecommunications companies that do not hold a CMRS license but have a "use case" that has been approved by the four major wireless carriers in the U.S. ("Non-CMRS").  Doc. 116, Ex. 4 at 42:23-43:2; Doc. 120 at ¶ 4.  SMS and MMS message traffic predominantly occurs between individual wireless telecommunications customers.  Messages are identified as either person-to-person ("P2P") messages, typically delivered from one human subscriber to another via carrier, or application-to-person ("A2P") messages, usually software communicating with a person, or carrier subscriber.  Doc. 120 at ¶ 2.

---

[1] Syniverse disputes the categorization of tyntec as an ICV as there is no binding definition of an ICV, and tyntec had no carrier customers at the inception of this suit while SAP and Syniverse had numerous wireless carrier customers.  Doc. 134 at ¶ 16; *see also* ¶¶ 5, 26.

Some telecommunication companies charge per-message fees to Non-CMRS companies who wish to deliver messages to carrier subscribers. Doc. 120 at ¶ 6. As a result, some Non-CMRS companies disguise A2P messages as P2P traffic to avoid paying fees; this is also known as "gray routing." Doc. 120 at ¶ 18. In turn, some telecommunication companies rely on ICVs for policing of A2P messages and messages from Non-CMRS companies, including ensuring Non-CMRS have approved use codes and do not spam customers. Doc. 120 at ¶ 5; Doc. 131 at ¶ 5. Syniverse is contractually obligated to some of its telecommunication carriers to stop unwanted A2P and Non-CMRS messages. Doc. 120 at ¶ 18. Efforts to stop unwanted A2P and Non-CMRS messages are complicated, labor-intensive, and expensive for ICVs. Doc. 120 at ¶ 18.

The two largest ICVs providers in the United States are Syniverse and SAP. Syniverse enjoys between a 75% and 80% market share of the U.S. ICV market. Doc. 116, Ex. 5 at 237:3-238:3. tyntec alleges "a dangerous possibility" of Syniverse acquiring monopoly power because there are high barriers to entry into the ICV market, and Syniverse is presently using its power to exclude tyntec by "increasing tyntec's peering costs to anti-competitive levels." Doc. 42 at ¶ 104(c).

## A. Peering Agreements

ICVs interconnect with other ICVs through peering agreements. Wireless customers have become accustomed to being able to send messages from any wireless provider to any other, yet no ICVs provider has an agreement with every wireless provider. Therefore, ICVs have established peering agreements between themselves to deliver messages to their respective telecommunication clients and improve their reach and message delivery

capabilities.  Doc. 116, Ex. 2 at ¶ 8, Ex. 22 at ¶ 9, Ex. 23 at ¶ 8; Doc. 52-1 at ¶¶ 4-19; Doc. 237, Ex. 76 at 155:16-157:8.

Historically, parties to peering agreements do not directly charge each other for carrying the other's messaging traffic, but rather pass the charges on to the telecommunications carriers for providing the interconnectivity.  Doc. 42 at ¶ 61.  This billing arrangement is referred to as "bill and keep," which has been the business model employed between Syniverse and other ICVs for more than twelve years.  Doc. 42 at ¶¶ 37, 38, 51, 62.

Syniverse, however, has never directly entered into a domestic peering agreement with tyntec.[2]  Syniverse's peering agreements with tyntec originated as peering agreements between Syniverse and Iris Wireless LLC ("Iris"), an ICV.  Doc. 120 at ¶ 19.  Syniverse's first peering agreement with Iris, executed in 2004, was amended in 2011 and 2012 to account for international message traffic imbalance.[3]  Doc. 120 at ¶ 22.  By 2014, Syniverse decided not to renew the peering agreement with Iris and exercised its contractual right to terminate.  Doc. at 120 ¶ 30.  In response, Iris filed a lawsuit seeking a temporary restraining order to keep the agreement in place and, after amending its complaint, alleging an antitrust violation.  Doc. 120 at ¶ 31; *see* Doc. 11 in *Iris Wireless LLC v. Syniverse Techs.*, No. 8:14-cv-1741-T-30TGW (M.D. Fla.) ("Iris Litigation").  However, by late 2014, Syniverse and Iris settled the lawsuit.

---

[2] Syniverse asserts that it has never done business with tyntec for P2P messaging prior to tyntec's acquisition of the peering agreements at issue in this suit.  Doc. 120 at ¶ 54.  tyntec, however, asserts that tyntec and Syniverse did have a business relationship for messaging in the form of an International SMS Hubbing Interconnect Services Agreement dated November 1, 2007.  Doc. 120-9 at Ex. 67.

[3] Syniverse's corporate representative, Christopher Wright, testified:"[Syniverse] noticed that all the traffic was mainly coming from Iris Wireless.  So [Syniverse] wanted to make sure that [it was] compensated and covered [its] potential losses for those termination fees.  So [Syniverse] went through an amendment process to amend the agreement [with Iris] to cover those termination fees."  *See* Doc. 236, Ex. 10 at 158:21-162:23.

Doc. 120 at ¶ 34; Doc. 131 at ¶ 34.  The Wireless Peer-to-Peer Messaging Peering Services Agreement Between Syniverse and Iris Wireless ("P2P Agreement") and the MMS Interworking Services Agreement Between Syniverse and Iris Wireless ("MMS Agreement"), both dated April 7, 2015, (collectively, the "Iris Peering Agreements") at issue here resulted from the Iris Litigation and were part of a package settlement deal.  Doc. 42 at ¶ 60; Doc. 120 at ¶ 53; *see also* Docs. 65-1, 65-2.  The Iris Peering Agreements provide for an initial two-year term with the option for one-year renewals.[4]  Either party could choose to not renew with 90 days' written notice.  Syniverse, however, did not plan to renew the Iris Peering Agreements with Iris because Iris's "only real customers were not companies that were licensed wireless telecommunications carriers but companies that traffic in SMS-IP messages."[5]  *See* Doc. 52-1 at ¶ 30.  Syniverse asserts that it did not earn a profit from the Iris Peering Agreements, Iris did not provide Syniverse any reach to carriers, and the Iris Peering Agreements were not otherwise beneficial to Syniverse.  Doc. 120 at ¶ 57.

The Iris Peering Agreements were non-transferable without Syniverse's consent unless a company (1) merged with, acquired, or purchased a controlling interest in Iris, or (2) purchased all or substantially all of Iris's assets.  Doc. 120 at ¶ 56; Doc. 236, Ex. 42.  In June 2016, tyntec acquired all of Iris's assets, including the Iris Peering Agreements and its existing

---

[4] *See* Doc. 65-1, P2P Agreement, § 10.1; Doc. 65-2, MMS Agreement, § 10.1. ("This Agreement shall commence on the Effective Date and shall continue in full force and effect for two (2) year [sic] from the Effective Date (the "Initial Term").  This Agreement shall automatically be renewed for successive one (1) year terms (each a "Renewal Term") unless and until any Party gives the other Parties ninety (90) days' prior written notice prior to the end of the Initial Term or the applicable Renewal Term of its intent to terminate this Agreement as of the end of such Term.").

[5] SMS-IP companies obtain access to blocks of 10-digit telephone numbers to be used as the originating or terminating number for sending text messages over the Internet.  Doc. 52-1 at ¶ 30.  In those instances, Syniverse charges a "transit fee" when routing SMS-IP traffic to Syniverse's wireless telecommunications carrier customers.  *Id.*

business.[6]  Doc. 116, Exs. 29, 30; Doc. 120 at ¶ 49.  In August 2016, tyntec gave Syniverse notice that Iris had transferred the Iris Peering Agreements to tyntec.  Doc. 120 at ¶ 52.

Syniverse was concerned about tyntec's acquisition of the Iris Peering Agreements for several reasons.  tyntec had never provided ICV Services in North America to wireless carriers.  Doc. 120 at ¶ 54.  Syniverse questioned whether tyntec had the technical proficiencies to provide ICV services. Doc. 120 at ¶ 54.  Syniverse knew of tyntec as an A2P operator in Europe and believed tyntec engaged in gray routing messages. Doc. 120 at ¶ 55.  Syniverse was unsure if tyntec intended to use the Iris Peering Agreements to deliver Non-CMRS messages or gray route messages.  Doc. 120 at ¶ 55.  Finally, Syniverse remained (and remains) unsure whether Iris appropriately transferred the Iris Peering Agreements.  Doc. 120 at ¶ 64.  As such, Syniverse weighed whether to peer with tyntec for the five months left in the Initial Term of the Iris Peering Agreements.  Doc. 120 at ¶ 64.

## B. Alleged Antitrust Violations

On November 10, 2016, Syniverse conveyed to tyntec its intent not to renew the Iris Peering Agreements.[7]  Doc. 42 at ¶ 5; Doc. 65-3 (the "November Letter").  The November Letter expressed Syniverse's skepticism concerning the validity of the assignment of the Iris Peering Agreements to tyntec, but also conveyed Syniverse's decision to honor the Iris

---

[6] tyntec's acquisition of Iris's assets originated with an option agreement entered into between Iris and Enigma Technology Services Consulting, Ltd. ("Enigma"), a personal holding company for a tyntec officer. Doc. 120 at ¶ 45; Doc. 131 at ¶ 45. Under the option agreement, Enigma could acquire the Iris Peering Agreements and an Iris-SAP peering agreement. Doc. 120 at ¶ 45.  On June 28, 2016, Enigma assigned the option agreement to Phoenix Spring, Ltd ("Phoenix"), which was an acquisition company formed by tyntec. Doc. 120 at ¶ 49. On June 29, 2016 Phoenix exercised the option.  Doc. 120 at ¶ 50; Doc. 42 at ¶¶ 18, 21, 48, 60. Phoenix was later renamed tyntec Group Ltd.  The peering agreement between Iris Wireless and SAP was also acquired by tyntec. *See* Doc. 42 at ¶ 48.

[7] The Initial Term of the Iris Peering Agreements terminated on April 7, 2017, during the pendency of this action.

Peering Agreements through April 7, 2017—the termination date of the Initial Term.  Doc. 65-3 at 3.  Syniverse stated that if tyntec desired to receive messaging services from Syniverse after April 7, 2017, it would be happy to provide tyntec with their "standard message aggregator agreement."  Doc. 65-3 at 3.  A "standard message aggregator agreement" would provide tyntec access to Syniverse's network by paying per-message and other fees for carrying tyntec's message traffic.  Doc. 42 at ¶ 63; Doc. 65-4.  tyntec characterizes the terms of the new proposed agreement set forth in the November Letter as evidence of a "predatory act that will exclude tyntec from the U.S.  ICV market."  Doc. 42 at ¶ 7.  tyntec alleges that despite the "long-standing, customary and mutually advantageous course of dealing, and without any legitimate pro-competitive justification," Syniverse intended to terminate the Iris Peering Agreements without knowing the volume of traffic tyntec planned to send Syniverse's telecommunications customers.  Doc. 42 at ¶ 5.  On December 14, 2016, Syniverse sent formal notice of termination effective April 7, 2017, in compliance with the terms of the Iris Peering Agreements.  Doc. 65-4.

On January 27, 2017, the President of tyntec Inc., Eddie DeCurtis, met with two representatives from Syniverse, Senior Vice President and General Manager of Connectivity and Mobility Services, John Wick, and Group Vice President for Syniverse, John McRae, in Tampa to negotiate a deal.  Doc. 42 at ¶ 9; Doc. 120 at ¶¶ 64, 66.  McRae presented new pricing terms to DeCurtis at the meeting.  Doc. 120 at ¶ 68.  According to Syniverse, these new terms were designed to reflect pricing that Syniverse had with customers similar to tyntec, such as Centurylink, *i.e.*, companies with a two Non-CMRS customer base.  Doc. 120 at ¶ 66.  As such, the pricing terms offered by Syniverse during the January 27 meeting were terms of a "customer agreement."  Doc. 131 at ¶ 75.  tyntec, however, wanted terms more like the Iris

Peering Agreements; specifically, bill and keep terms.  Doc. 120 at ¶ 73.  tyntec argues that Syniverse was attempting to use its U.S. market monopoly to exclude tyntec by breaking the "bill and keep" course of dealing that had existed among the U.S. ICVs since 2004 by charging tyntec exclusionary per-message fees for +1 to +1 SMS and MMS messages.  Doc. 117 at ¶¶ 53-68.  tyntec disagrees that it is similar to Centurylink, or other Syniverse customers, because those customers do not have ICV capabilities nor did they invest the time and money that tyntec did in developing those capabilities.  Doc. 131 at ¶¶ 66, 67.  tyntec further disputes that its customer base was "two Non-CMRS companies." [8]  Doc. 131 at ¶¶ 66, 67.  McRae expected tyntec to make a counteroffer to the January 27, 2017 proposed agreement.  Doc. 120 at ¶¶ 68, 109.

Subsequently, Syniverse claimed to have been drafting a peering agreement in reliance on tyntec's assurances, during a February 22, 2017, phone conference, that tyntec had signed a deal with Transaction Network Services ("TNS") to provide ICV services to 21 of its carriers.  Doc. 116, Ex. 60; Doc. 120 at ¶ 75.  In February 2017, McRae directed Niaz Alibhai, the Director of Production Management in charge of Syniverse's ICV business, and his supervisor, Kyle Spinks, to prepare a peering agreement that included reciprocal transit fees payable by each party with a "guard band" that only required payment if the messages were out of balance by more than an agreed upon percentage.  Doc. 120 at ¶ 75.  The execution of this agreement depended on tyntec's verification of the 21 wireless carriers.  Doc. 120 at ¶ 75.

---

[8] During the pendency of this litigation, tyntec negotiated and signed an exclusive contract to provide ICV services to Globe Telecom, the largest Philippine wireless carrier and a former Syniverse customer.  Doc. 116, Exs. 15, 72.  tyntec, however, did not procure this contract until January 2018.

McRae and DeCurtis met face-to-face again in March 2017 at a telecommunications trade show called Mobile World Congress.  Doc. 120 at ¶ 77.  They discussed the potential commercial relationship between Syniverse and tyntec, which McRae characterized as a reciprocal messaging agreement with certain protections for out-of-balance traffic (*e.g.*, "guardrails") provided that tyntec provide the names of its carrier customers.  Doc. 120 at ¶ 77.  tyntec, however, initiated this litigation on March 10, 2017, before DeCurtis could finish his negotiations.  Doc. 120 at ¶ 78.  tyntec's decision to sue ended the negotiations with Syniverse.  Doc. 120 at ¶ 78.  tyntec has continued trying to negotiate a "bill and keep" deal since filing suit, but Syniverse has refused tyntec's offers.[9]  Doc. 116, Ex. 57.  Syniverse claims that tyntec never actually wanted to negotiate a deal.  *See* Doc. 134 at ¶ 73.

The amended complaint alleges that Syniverse refused to deal with tyntec on the traditional "bill and keep" or "no-fee" terms and, instead, sought to impose a restructuring of the agreement that would require tyntec to pay a per message fee, much like the charge Syniverse charges its telecommunication carrier customers.  Doc. 42 at ¶ 6.  According to tyntec, peering agreements always "involve a bill and keep revenue model whereby Syniverse and tyntec do not charge each other for carrying messaging traffic, but where Syniverse and tyntec generate revenue by billing their respective telecommunications carrier customers and keeping the proceeds."  Doc. 42 at ¶ 51.  The amended complaint alleges that Syniverse

---

[9] Over a year after filing this lawsuit, tyntec offered to pay Syniverse $40,800 per year and then $48,000 per year in exchange for a bill and keep peering agreement.  Doc. 131 at ¶ 69; Doc. 120 at ¶ 109; Doc. 237, Exs. 118, 119.  Although not on bill and keep terms, Syniverse provided a counteroffer to tyntec's offer of $40,800 per year.  Doc. 120, Ex. 27 ("Syniverse is willing to enter into a new messaging agreement with tyntec based upon the current type of traffic that tyntec carries.  It is our understanding that none of tyntec's current customers are mobile network operators and therefore we believe the appropriate pricing is our SMS-IP aggregator pricing.").

possessed the specific intent to "unilaterally terminate a voluntary, beneficial, and profitable multi-year course of dealing in order to achieve an anti-competitive end—the destruction of tyntec—even at the risk of degrading Syniverse's own service in the short run by jettisoning its connectivity with tyntec and the subscribers that tyntec delivers." Doc. 42 at ¶ 69. tyntec's allegations, however, focus on the course of dealing between Syniverse and Iris.   The amended complaint further alleges that Syniverse's actions would "leave telecommunications carriers in the United States with only two ICVs to compete for their business – Syniverse and SAP.  And, if Syniverse eliminates SAP, telecommunications carriers would be left with no choice at all – only Syniverse.  This would leave Syniverse with the unrestricted ability to raise prices in the long run." *See* Doc. 42 at ¶ 70; *see also* Doc. 42 at ¶ 11.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if all the pleadings, discovery, affidavits, and disclosure materials on file show that there is no genuine disputed issue of material fact, and the movant is entitled to judgment as matter of law.  *See* Fed. R. Civ. P. 56(a) and (c).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  A fact is material if it is a legal element of the claim that may affect the outcome of the suit under the substantive governing law.  *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could find for the non-moving party.  *Anderson*, 477 U.S. at 248.  In determining whether a genuine dispute of material fact exists, the court must view the evidence and all factual inferences drawn therefrom in the light most favorable to the non-

moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).

The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mtn. Park, Ltd. v. Oliver,* 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson,* 477 U.S. at 252). Summary judgment "may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate price competition." *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1493 (11th Cir. 1988) (citing *Matsushita*, 475 U.S. at 594) (noting three Supreme Court decisions that vacated appellate reversals of district court orders granting summary judgment).

## III.   DISCUSSION

Section 2 of the Sherman Act prohibits the monopolization or attempted monopolization of "any part of the trade or commerce among the several States." 15 U.S.C. § 2. tyntec alleges that Syniverse both monopolized and attempted to monopolize the ICV industry in the United States by terminating the Iris Peering Agreements and refusing to offer any terms that would allow tyntec to remain as a competitor. tyntec also alleges claims for

tortious interference with a contract and tortious interference with a prospective business relationship based on the termination of the Iris Peering Agreements.  The Court will address each claim in turn.

### A.  Monopolization Claim

Monopolization under § 2 of the Sherman Act requires: (1) possession of monopoly power in the relevant market and (2) willful acquisition or maintenance of that monopolistic power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  *See U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). However, "[e]ven a company with monopoly power has no general duty to cooperate with its business rivals and may refuse to deal with them if valid business reasons exist for such refusal." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004) (citing *Mid-Texas Commc'ns Sys., Inc. v. Am. Tel & Tel. Co.*, 615 F.2d 1372, 1388 (5th Cir. 1980)[10]). The purpose of the Sherman Act, however, is not to force firms to help one another as the results themselves would likely be inconsistent with the goals of antitrust law.  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013).  "In the absence of any purpose to create or maintain a monopoly, … a company may deal or refuse to deal with whomever it pleases." *Morris Commc'ns*, 364 F.3d at 1294-95 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)).

In fact, "'as a general rule … purely unilateral conduct' does not run afoul of section 2 – 'businesses are free to choose' whether or not to do business with others and free to assign what prices they hope to secure for their own products.'"  *Novell*, 731 F.3d at 1072 (quoting

---

[10] The case law of the Fifth Circuit prior to September 30, 1981 has been adopted as precedent in this judicial circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 1209 (11th Cir. 1981) (en banc).

*Pac. Bell Tel. Co. v. Linkline Commc'ns*, 555 U.S. 438, 448 (2009)); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004) ("[T]he Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (quotations and citation omitted; alteration in the original)).   The Supreme Court has "been very cautious in recognizing … exceptions" to this long-recognized rule "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Trinko,* 540 U.S. at 408.  Accordingly, there are only a few "rare" exceptions to this general rule.  *Novell, Inc.*, 731 F.3d at 1073.  Refusal to deal is one of these exceptions and is what tyntec alleges occurred here.  *Id.*  "Refusal to deal doctrine targets only a discrete category of section 2 cases attacking a firm's unilateral decisions about with whom it will deal and on what terms." *Id.* at 1076.

To bring a claim for a refusal to deal, a party must show not just a refusal to deal, but a refusal that was unlawful.  At least two elements must be present in order to establish a refusal as unlawful.  First, there must be a "preexisting voluntary and presumably profitable course of dealing between the monopolist and rival." *Novell*, 731 F.3d at 1074.  This requirement protects from antitrust liability unadulterated, unilateral conduct where no course of dealing ever existed.  *Id.*  Second, "the monopolist's discontinuation of the preexisting course of dealing must 'suggest[] a willingness to forsake short-term profits to achieve an anti-competitive end.'" *Id.* at 1075 (quoting *Trinko*, 540 U.S. at 407) (alteration in the original).  Moreover, this proof must be more than just the monopolist deciding to forsake short-term profits; "the monopolist's conduct must be irrational but for its anticompetitive effect." *Id.* at 1075 (citing *Aspen Skiing*, 472 U.S. at 597 (a refusal to deal with a competitor

doesn't violate § 2 if "valid business reasons exist for that refusal"); *Trinko*, 540 U.S. at 407 (defendant must be seeking "an anti-competitive end"); 3B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 772, at 223 (3d ed. 2008) (the refusal must be "irrational" but for its anticompetitive tendencies); Gregory J. Werden, *Identifying Exclusionary Conduct Under Section 2: The "No Economic Sense" Test,* 73 Antitrust L.J. 413, 422–25 (2006)).  With this in mind, the Court turns to the required elements of a monopolization claim.

### 1. *Relevant Market & Monopoly Power*

When determining whether a defendant has violated § 2 of the Sherman Act, the Court first determines the relevant market and then decides whether the defendant possessed monopoly power in that market.  *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993). The relevant market has two components: the geographic market and the product market.  *Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1263 (11th Cir. 2015).  "The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (quoting *Grinnell*, 384 U.S. at 572).  The Court cannot decide the relevant market and market power based on the record before it.

Defining the relevant product market is a fact-intensive endeavor.  *Duty Free Americas*, 797 F.3d at 1264.  A product market consists of "products that have reasonable interchangeability for the purposes for which they are produced."  *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 828 (11th Cir. 2015) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)). "The reasonable interchangeability of use or the cross-elasticity of demand between a product and its substitutes constitutes the outer boundaries of a product market for antitrust purposes." *U.S. Anchor*, 7 F.3d at 995 (footnote omitted). "[A] high cross-elasticity

of demand indicates that the two products in question are reasonably interchangeable substitutes for each other and hence are part of the same market." *Jacobs v. Tempur–Pedic Int'l, Inc.*, 626 F.3d 1327, 1337 n.13 (11th Cir. 2010). tyntec argues that the relevant product market is the market for ICV services for which there is no viable economic substitutes. Doc. 116 at 13-14. Syniverse contends Over-The-Top ("OTT") applications like WhatsApp, Facebook Messenger, and iMessage provide messaging services that compete with ICVs. Doc. 134 at ¶ 10.

The relevant geographic market is defined as "the area of effective competition in which a product or its reasonably interchangeable substitutes are traded." *Duty Free Americas*, 797 F.3d at 1263 (quoting *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 423 (11th Cir. 1984)). The Court considers whether outside sellers are precluded from entering the market and whether consumers could realistically obtain the product from outside the geographic area. *See id.* (citing *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991)). Therefore, barriers to expansion, including "transportation costs, delivery limitations and customer convenience and preference" are relevant to this determination. *Id.* (quoting *L.A. Draper & Son*, 735 F.2d at 423). tyntec argues that the relevant geographic market is the United States. tyntec asserts that Syniverse has a monopoly on ICV services within the United States due to its market share of between 75% and 80%. Doc. 116, Ex. 5 at 237:3-238:3. Syniverse does not dispute its market share in the United States but argues that the relevant ICV market is a global market. Price competition in the global market is extremely competitive and includes other ICV companies like SAP, TNS, BICs, and Orange France. Doc. 134 at ¶¶ 15, 32, 38.

15

The parties have established that material issues of fact exist as to the relevant market. Because "[t]he parameters of a given market are questions of fact . . . summary judgment is inappropriate if there are material differences of fact." *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1573–74 (11th Cir. 1991) (citation omitted). Regardless of whether Syniverse possessed monopoly power in the relevant market, however, Syniverse is entitled to summary judgment because, as shown below, it did not refuse to deal with tyntec, the parties did not have a preexisting voluntary and presumably profitable course of dealing, and Syniverse had valid business justifications for its actions. Therefore, even if Syniverse is monopolistic, it has not violated § 2 of the Sherman Act.

### 2. *Refusal to Deal*

tyntec argues that Syniverse's refusal to agree to a "bill and keep" arrangement or alternate but feasible terms constitutes a refusal to deal. The record, however, reflects that Syniverse's actions were lawful.

Syniverse first offered tyntec a "standard message aggregator agreement" in the November Letter, which would provide tyntec access to Syniverse's network by paying per-message and other fees for carrying tyntec's message traffic. Doc. 42 at ¶ 63; Doc. 65-4. Thereafter, on January 27, 2017, Syniverse provided tyntec with proposed terms that tracked agreements it had with companies Syniverse believed to be similarly situated to tyntec (*i.e.*, Centurylink). In addition, it is undisputed that the parties' negotiation did not end on January 27, 2017. Based on tyntec's representations that it had signed an exclusive deal to provide ICV services for P2P messaging for "ten wireless carriers," McRae explained during a February 22, 2017, conference call with tyntec that Syniverse required the carriers' names in order to negotiate a new agreement. Doc. 120 at ¶¶ 72, 73. DeCurtis later represented to

Syniverse that there were actually 21 wireless carriers.  Doc. 120 a ¶ 74.  Based on this representation regarding tyntec's expanded customer base, McRae instructed Alibhai and his supervisor, Spinks, to begin drafting a peering agreement.  Doc. 120 at ¶ 75.  The peering agreement was to include reciprocal transit fees payable by each party with a "guard band" that only required payment if the messages were out of balance by more than an agreed upon percentage.  Doc. 120 at 75.  While tyntec disputes whether Syniverse began drafting such an agreement, it does not dispute that McRae and DeCurtis subsequently met face-to-face in March 2017 at a telecommunications trade show called Mobile World Congress, discussed the potential commercial relationship between Syniverse and tyntec, and were still negotiating an agreement based on tyntec's representations of an expanded customer base.  Doc. 120 at ¶ 77; Doc. 131 at ¶ 75, 77.  Shortly thereafter, however, tyntec filed this suit on March 10, 2017.  Doc. 1.  As such, there is no genuine issue of material fact as to whether Syniverse was willing to negotiate an agreement with tyntec, albeit on terms other than strictly "bill and keep."

Indeed, tyntec acknowledges that Syniverse attempted to negotiate a deal with tyntec but argues that Syniverse's offers, if accepted, would force tyntec to exit the market.  Doc. 116 at 32.[11]  In other words, tyntec urges this Court to consider Syniverse's offers as "practical refusals to deal" because they were offers that tyntec could not accept.  *See MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004) ("An offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal.").  tyntec, however, does not explain specifically why it was unable to accept Syniverse's initial or subsequent offers and does not submit any pertinent evidence in support of the proposition

---

[11] Page number references are to the CM/ECF electronic page number of the document, not to the movant's page numbering.

that tyntec would be "forced to exit the market" based on the terms offered by Syniverse. tyntec only asserts that "the January 2017 Proposal was so far afield of a 'bill and keep' course of dealing, tyntec could not possibly accept it," cites to the deposition testimony of tyntec Group, Ltd.'s board member Roland Dennert, and parenthetically describes the testimony as "noting that Syniverse's offer of a customer agreement was not a basis for negotiation, as it would not have allowed tyntec to compete in the U.S. ICV market." Doc. 130 at 26. This deposition testimony, however, does not support its contention as it fails to address tyntec's inability to compete, does not mention tyntec being "forced to exit the market," does not define "compete," and does not explain or support why the terms of the "customer agreement" offered by Syniverse were unreasonable. Doc. 236, Ex. 5 at 170:22-172:6. As such, this testimony does not create a material factual dispute as to whether Syniverse's offers equate to practical refusals to deal.

tyntec likens its situation to that found in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985), where the defendant extended an offer plaintiff could not accept. In *Aspen Skiing*, the defendant owned three of the four mountains comprising the ski area of Aspen, Colorado. The plaintiff owned the fourth mountain. For many years, the parties had jointly offered a multiple-day, multiple-area ticket that gave skiers admission to all four mountains (the "Joint Ticket"). *Id.* at 589–90. The Joint Ticket was often cheaper than purchasing multiple single-day tickets. *Id.* at 589. Revenues from the Joint Ticket were divided between the parties according to the relative percentage that buyers with the Joint Ticket used each mountain. *Id.* The defendant decided to discontinue the Joint Ticket by giving the plaintiff "an offer that it could not accept"—the defendant would continue participating in the Joint Ticket only if the plaintiff agreed to receive a fixed percentage of

18

Joint Ticket revenues that was considerably lower than the historical average revenue based on actual usage of the plaintiff's mountain. *Id.* at 592. After the plaintiff rejected the offer, the defendant sold a joint ticket featuring only its three mountains. *Id.* at 593. The plaintiff attempted to market its own multiple-day, multiple-area package by offering ski passes to its mountain along with vouchers, each equal to the retail price of a single-day ticket, to defendant's three mountains. *Id.* at 593–94. The defendant, however, refused to accept these vouchers and to sell any of its lift tickets to the plaintiff at retail price. The Supreme Court upheld a jury verdict for the plaintiff, finding that "[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition … over the long run by harming its smaller competitor." *Id.* at 608. While considered the leading case for § 2 liability regarding refusal to deal claims, the Supreme Court subsequently recognized that "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Trinko,* 540 U.S. at 409; *see also Novell*, 731 F.3d at 1074 ("Refusal to deal doctrine's high water mark came in *Aspen*.").

Here, unlike the *Aspen Skiing* defendant, Syniverse is not demanding that tyntec agree to a revenue or cost structure that is considerably out of sync with actual usage. To the contrary, Syniverse's offers were based on either a per message basis (*i.e.*, usage) or a "guard band" that only required payment if the messages were out of balance by more than an agreed upon percentage. Syniverse's offers demonstrated a willingness to engage in a cost structure that accounted for the relative percentage that each parties' customers used ICV services. In this regard, Syniverse's offers were more analogous to the historical agreement that was terminated by the defendant in *Aspen Skiing.*

Moreover, tyntec's insistence on a "bill and keep" agreement is distinguishable from the plaintiff in *Aspen Skiing*. To put tyntec's position in the context of *Aspen Skiing*, tyntec essentially wants to bill its customers for, and keep all revenue from, a ski ticket that its competitor must honor at their mountains regardless of whether tyntec's customers are disproportionately using the competitor's mountains. To go a step further, tyntec appears to want to be able to undercut the defendant by selling its ski ticket (*i.e.*, ICV service) at a price below what its competitor charges its own customers. *See* Doc. 116-1, Ex. 3 at ¶ 40, Ex. 62 at 0130 (tyntec was willing to sell ICV services to companies at prices lower than those offered by Syniverse). Neither *Aspen Skiing*, nor antitrust law generally, require a company to continue offering its competitor such favorable terms just because it may have done so in the past.

In addition, the Supreme Court, in *Aspen Skiing,* found "defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Trinko*, 540 U.S. at 409 (emphasis in original). The defendant's refusal to sell to the plaintiff at the prevailing retail price, in the Supreme Court's view, indicated a willingness to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition. *See Aspen Skiing*, 472 U.S. at 608. Here, Syniverse is attempting to charge tyntec the equivalent of retail prices, which indicates that it is attempting to maximize both short and long-term benefits. Syniverse has entered into agreements with Non-CMRS customers for the delivery of approved messages to telecommunication customers on a per-message fee. Doc. 120 at ¶ 14. Syniverse's offer to tyntec was consistent with its pricing to some of Syniverse's other SMS-IP customers. Doc. 237, Ex. 78 at ¶ 44. For example, for its first five million MMS messages in a given month, Twilio pays the same rate per MMS Message as

20

Syniverse offered to tyntec. *Id.* In this regard, tyntec's insistence on a "bill and keep" agreement and refusal to pay retail rates more closely resembles the *Trinko* plaintiff and its insistence that the defendant had to deal with its rivals at cost. *See Trinko*, 540 U.S. at 409 ("[Defendant's] reluctance to interconnect at the cost-based rate of compensation … tells us nothing about dreams of monopoly."); *see also Duty Free Americas*, 797 F.3d at 1267-68 (finding plaintiff's resistance of defendant's across the board price increases more similar to *Trinko* plaintiff than *Aspen Skiing* plaintiff).

tyntec also raises comments made by Alibhai as evidence that Syniverse was attempting to exclude tyntec from the U.S. ICV market. These comments, however, do not suggest Syniverse intended to forgo profits. *See Novell*, 731 F.3d at 1078 (holding correspondence not anticompetitive if only shows "uncharitable intent towards rival); *see also Conoco Inc. v. Inman Oil Co.*, 774 F.2d 895, 905 (8th Cir. 1985) (finding statements that head of division wanted "to drive [plaintiff] out of business" and wanted "100% of the lubricant business in the region" insufficient for attempt to monopolize intent).

Finally, the fact that Syniverse did not accept tyntec's proposals in April and May 2018, to pay Syniverse a monthly fixed fee is also irrelevant to the analysis of tyntec's refusal to deal claim because tyntec's offers occurred after tyntec had initiated this litigation.[12] An antitrust suit filed against a party is a legitimate reason for that party's refusing to deal. *See House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 871 (2d Cir. 1962) (holding refusal to deal with litigating customer was not unreasonable because "the relationship between a manufacturer and his customer should be reasonably harmonious; and the bringing of a

---

[12] The Amended Complaint, for obvious reasons, does not contain allegations regarding tyntec's subsequent proposals or Syniverse's response thereto. Doc. 42; *see* n.9 *supra.*

lawsuit by the customer may provide a sound business reason for the manufacturer to terminate their relation"); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 890-91 (9th Cir. 1982) (affirming summary judgment for defendants on an antitrust claim where defendants' aim to avoid future litigation after settlement with plaintiffs constituted a legitimate business reason for refusing to deal). As such, tyntec's proposals made after initiating litigation are immaterial, and the undisputed material facts establish that Syniverse has not refused to deal with tyntec.

### 3. *Voluntary Course of Dealing*

Even if tyntec could establish a genuine issue of material fact regarding Syniverse's refusal to deal, it has not shown a course of established, voluntary, and profitable dealing between tyntec and Syniverse as required for a refusal to deal claim. tyntec argues that its course of dealing with Syniverse is derivative of the course of dealing between Iris and Syniverse; *i.e.*, tyntec contends it stepped into the shoes of Iris with the assignment of the Iris Peering Agreements, and Syniverse's course of dealing with Iris satisfies the voluntary, continuous and profitable course of dealing requirement. In support of this contention, tyntec argues that "[c]ase law from this state and district makes clear that, where a contract is assigned, the assignee 'stands in the shoes' of its assignor and has the legal right to enforce contract provisions and to pursue causes of action that the assignor would have been able to pursue." Doc. 130 at 32. tyntec then makes the tenuous argument that it, therefore, "has the right to pursue causes of action derived from the Peering Agreements, including this refusal to deal claim." Doc. 130 at 33. The cases cited by tyntec in support stand for the proposition that "[a]n assignment is a transfer of all the interests and rights to the thing assigned." *Gateway Greens Cmty. Ass'n, Inc. v. Comcast of the South, Inc.*, No. 2:09-cv-652-FtM-DNF, 2011 WL

1832724, at *3 (M.D. Fla. May 13, 2011) (quotations and citations omitted).  Indeed, the general rule is that the assignee "stands in the shoes of the assignor" and is able to enforce the terms of the contract.  *Id.*

To the extent tyntec is arguing that it has the right to pursue a refusal to deal claim because Iris had such a cause of action, the argument fails.  First, the refusal to deal claim as alleged had not accrued prior to the assignment of the Iris Peering Agreements.  Moreover, even if a claim had accrued that could be assigned, an explicit assignment of an antitrust claim from Iris to tyntec would be required, and the record does not establish such an assignment. *See Winn-Dixie Stores, Inc. v. Southeast Milk, Inc.*, No. 3:15-cv-1143-J-39PDB, 2019 WL 2347021, at *4 (M.D. Fla. Apr. 18, 2019) (citing *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 438-39 (3d Cir. 1993) ("Because we conclude that the inclusion of antitrust claims in a general assignment would be disfavored under the direct purchaser rule, we hold that only an express assignment of an antitrust claim can be valid."); *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1278 n.7 (11th Cir. 2008) (following *Gulfstream* in a copyright infringement case involving the application of the one-satisfaction rule to federal claims); *In re Prudential of Fla. Leasing, Inc.*, 478 F.3d 1291, 1302 (11th Cir. 2007) (citing *Gulfstream* in a bankruptcy matter regarding issues of settlements involving multiple claims and parties); *In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 198 (E.D. Pa. 2017) ("In order to be effective, the assignment must expressly relate to antitrust claims; a general assignment is insufficient." (citing *Gulfstream*, 995 F.2d at 437-39)); *Texas Life, Acc. Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Entm't Co.*, 105 F.3d 210, 218 (5th Cir. 1997) ("[O]nly an express and knowing assignment of an ERISA fiduciary breach claim is valid." (citing

*Gulfstream*, 995 F.2d at 439))).  As such, there has been no assignment by Iris to tyntec of an antitrust claim.

tyntec's argument that Syniverse's course of dealing with Iris was assigned to tyntec along with the Iris Peering Agreements is equally unavailing.  None of the cases cited by tyntec extend the assignee's ability to enforce the terms of an assigned contract to include the assignee's assumption of the assignor's course of dealing history in an antitrust refusal-to-deal claim.  *See Gateway Greens*, 2011 WL 1832724, at *3; *Dep't of Revenue v. Bank of Am., N.A.*, 752 So.2d 637, 642 (Fla. 1st DCA 2000); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 311 F. Supp. 3d 468 (D.R.I. 2018).  In addition, in the context of antitrust litigation, the prior course of dealing between two parties is used, in part, as a gauge by which to measure the anticompetitive motivation of a defendant's refusal to deal, and, as such, Syniverse's prior course of dealing with Iris would be irrelevant to Syniverse's motivation when dealing with tyntec.  *See   Trinko*, 540 U.S. at 409 ("The complaint does not allege that [defendant] voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion.  Here, therefore, the defendant's prior conduct sheds no light upon the motivation of its refusal to deal—upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice.").  It is, therefore, counterintuitive that the course of dealing between Syniverse and Iris, even if assignable, would be considered by the Court when determining Syniverse's motivation for terminating the Iris Peering Agreements as assigned to tyntec or for the terms offered during re-negotiation of an agreement with tyntec.

Similarly, the assignment of the Iris Peering Agreements to tyntec belies the required "voluntary" aspect of the course of dealing between tyntec and Syniverse.  *See, e.g., Covad*

24

*Commc'ns Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004) (affirming dismissal of refusal to deal claim where the relationship between the monopolist and rival was mandated by the Federal Telecommunications Act "and thus cannot be said to have initiated a 'voluntary' course of dealing, profitable or otherwise"); *see also Trinko*, 540 U.S. at 409.  It is undisputed that Syniverse and tyntec never had an ICV relationship prior to tyntec's acquisition of the Iris Peering Agreements.  Doc. 120 at ¶¶ 54-55, 80, 84, 113 (tyntec had never before provided ICV services in North America).  There is no evidence that Syniverse would have entered into a peering agreement with tyntec absent tyntec's acquisition of the Iris Peering Agreements.  As in *Trinko*, this lack of voluntary course of dealing removes the ability to gauge Syniverse's motivation for its conduct as competitive zeal or anticompetitive malice.  Because Syniverse's relationship with tyntec was not "voluntary" but imposed by tyntec's acquisition of the Iris Peering Agreements, tyntec's refusal to deal claim fails.  *Covad*, 374 F.3d at 1049 ("*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under *Aspen*.").

tyntec also argues a course of dealing has been established directly between Syniverse and tyntec.  Specifically, tyntec points to the fact that tyntec and Syniverse have been exchanging SMS and MMS messages on bill and keep terms for two customers, Flyp and Shelcomm, since late 2016 when tyntec acquired the Iris Peering Agreements.  Doc. 130 at 33.  The bill and keep terms for tyntec's two customers, however, was inherited under the Iris Peering Agreements, and, for the reasons discussed above, does not constitute a voluntary course of dealing.  In addition, any continuation of this course of dealing after the April 2017 termination of the Iris Peering Agreements was borne only from the initiation of this litigation.

Even if the Court gave credence to the assignability of Iris's course of dealing to tyntec, the course of dealing between Syniverse and Iris was not profitable and, therefore, would still not satisfy this requirement.  tyntec argues that Syniverse and Iris's course of dealing must have been profitable at least to some extent because Syniverse would not have continued its peering relationship with Iris for over a decade otherwise.  tyntec also argues that the course of dealing would have been profitable absent Syniverse's sabotage of Iris's customer relationships.  However, "unadorned representations of counsel cannot create genuine issues of material fact."  *Davidson v. Gov't Emps. Ins. Co.*, No. 8:09-cv-727-T-33MAP, 2010 WL 4973494, at *4 n.7 (M.D. Fla. Dec. 1, 2010) (quotation and citation omitted).  Regardless of whether Syniverse's peering relationship with Iris could have potentially been profitable given various alternate scenarios, there is no dispute that the Iris Peering Agreements were, in fact, of no financial benefit to Syniverse.  *See* Doc. 120 at ¶¶ 108, 110; Doc. 116, Ex. 7 at 513 (email dated 2/28/2017 from Alibhai to Spinks regarding draft contract for tyntec stating "There is no financial gain for us to sign them up as they would be more dependent on us for reach and with that comes high overhead.").  Where, as here, there is no evidence that Syniverse has sacrificed short-term profits to further an anticompetitive agenda, tyntec cannot prevail.

### 4. *Business Justifications for Refusal to Deal*

Even assuming tyntec could establish Syniverse's refusal to deal along with a prior voluntary and profitable course of dealing, the claim will still fail if Syniverse had a valid business justification for the refusal.  *See, e.g., Morris Commc'ns*, 364 F.3d at 1295 ("refusal to deal that is designed to protect or further the legitimate business purposes of a defendant does not violate the antitrust laws, even if that refusal injures competition"); *Tech. Res. Servs., Inc. v. Dornier Med. Sys., Inc.*, 134 F.3d 1458, 1466 (11th Cir. 1998) ("A defendant can escape § 2

liability if the defendant's actions can be explained by legitimate business justifications."). Once the defendant has shown valid business justifications, the burden shifts and the plaintiff must show that the defendant's proffered business justifications are pretextual. *Morris Commc'ns*, 364 F.3d at 1296.

Syniverse asserts several reasons for not renewing the Iris Peering Agreements with tyntec: it had concerns about the validity of the assignment of the Iris Peering Agreements from Iris to tyntec; it was worried that tyntec would send A2P messages over the P2P network; and there was no "strategic advantage" for Syniverse to have a peering arrangement with tyntec. Doc. 119 at 30-33. tyntec contends that Syniverse's proposed justifications for terminating the Iris Peering Agreements are pretextual. Specifically, it asserts that the timing of Syniverse's decision to terminate the Iris Peering Agreements renders Syniverse's business justifications pretextual. tyntec argues that it is "obvious that Syniverse's real motivation in terminating the Peering Agreements was to exclude tyntec from the U.S. ICV market; not the 'business justifications' that Syniverse cites...." Doc. 130 at 39.

Syniverse first asserts that it was apprehensive about tyntec's acquisition of the Iris Peering Agreements because it received inadequate information and answers from tyntec when trying to determine whether the assignment of the Iris Peering Agreements was valid.[13] Doc. 120 at ¶¶ 59, 60, 63. tyntec contends that representatives of tyntec and Iris answered Syniverse's questions in emails and at least two conference calls. Doc. 237, Exs. 131, 132, 133. tyntec also points to the timing of the November Letter and asserts that, because the November Letter was sent to tyntec less than 24 hours after receiving tyntec's answers to

---

[13] In the absence of Syniverse's prior written consent, assignment of the Iris Peering Agreements could only be validly made in connection with a sale of all or substantially all of Iris's assets. Doc. 120 at ¶ 56; Doc. 236, Ex. 42.

Syniverse's questions, this business justification is pretextual.  Specifically, tyntec argues that there had not been enough time for Syniverse to have seriously considered tyntec's responses. Doc. 130 at 38.

The November Letter, however, details the contradictory information Syniverse received in response to its questions and concludes:

> Syniverse strongly believes that it does not have any obligation, based on the information it has received to date, to recognize the attempted assignment of the Peering Agreements from Iris Wireless to [tyntec].  However, at this point Syniverse does not desire to incur additional effort or expense on this matter. Therefore we will provide the information that [tyntec] is requesting and provide the services outlined in the Peering Agreements to [tyntec] until they expire on April 7, 2017.  Under separate letters, Syniverse will be providing the written notices described in … [the Peering Agreements] of Syniverse's intention not to renew the Peering Agreements.  If [tyntec] desires to receive messaging services from Syniverse after April 7, 2017, we will be happy to provide [tyntec] with our current standard message aggregator agreement.

Doc. 236, Ex. 42.   tyntec does not dispute Syniverse's summary of the contradictory information regarding the assignment of the Iris Peering Agreements outlined in the November Letter or the legitimacy of Syniverse's concerns regarding the same.  As evidence of pretext, tyntec simply relies on the proximity in time of the November Letter with some of tyntec's responses to some of Syniverse's inquiries.   This is insufficient evidence that Syniverse's concerns about the validity of the assignment of the Iris Peering Agreements was a pretextual business justification for terminating the Iris Peering Agreements.

Syniverse states that it was also worried that tyntec, because it was an A2P business, would use the Iris Peering Agreements to send A2P messages or only Non-CMRS messages to Syniverse's customers.  Syniverse asserts that this concern was justified because, in late 2016 and early 2017, tyntec did not have any wireless carrier customers, and other than DeCurtis's suggestion of 21 unnamed carriers, there was no indication that tyntec would be a

real partner for P2P messaging.  Doc. 119 at 32; Doc. 120 at ¶¶ 74, 80.  Syniverse also argues that it had rational financial fears that tyntec was free riding on Syniverse's labors.  Syniverse contends there is no dispute that the Iris Peering Agreements whether with Iris or as assigned to tyntec did not financially benefit Syniverse.  Doc. 119 at 32; Doc. 120 at ¶¶ 108, 110.  Syniverse points to the fact that tyntec has two small Non-CMRS customers with an "infinitesimal" amount of messaging traffic compared to Syniverse's relationships with more than a thousand carrier and Non-CMRS customers on a global scale.  Doc. 120 at ¶¶ 13-14, 66.  tyntec's argument that it "has indications of activity . . . that would map to an ICV" is not sufficient to establish pretext regarding these concerns.  Doc. 116 at 17.  Although tyntec asserts that its relationship with Globe Telecom, a Philippine carrier, qualifies tyntec as an ICV entitled to a peering agreement, this relationship is not relevant for purposes of this motion because tyntec did not enter into an agreement with Globe until a year after this litigation was filed.  Doc. 120 at ¶ 118.  As such, it cannot serve as evidence of pretext for Syniverse's decision to terminate the Iris Peering Agreements.

Syniverse's business relies in part on charging companies for the contractual right to send messages to those carriers.  As such, the Court does not find it "irrational" for Syniverse to want to charge tyntec rather than give its services away via tyntec's preferred billing terms.  *See Morris Commc'ns*, 364 F.3d at 1295-96 (finding defendant met its business justification burden by showing that defendant sought to prevent plaintiff from "free-riding" on defendant's technology and rejecting plaintiff's claims of pretext) (citing *Cont'l T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 55 (1977) (stating that prevention of "free-riding" by competitors is a legitimate business purpose); *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.,* 720 F.2d 1553, 1559 (11th Cir. 1983) (concluding that defendant "had a legitimate

interest in protecting from opportunistic appropriation its investment in acquiring the information necessary to carry on its business")).   Accordingly, summary judgment is additionally warranted on the basis of Syniverse's business justifications.  *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("[T]here is only a duty not to refrain from dealing where the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." (citations and internal quotations omitted)).

### 5. *Harm to Competition*

An antitrust plaintiff must show harm to competition in general rather than harm to an individual competitor.  *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004); *see also Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579 n.8 (11th Cir. 1985) ("Harm to competition is a necessary element of all private antitrust suits under Section[] … 2 of the Sherman Act…").  The Sherman Act is not intended to protect businesses from conduct that is competitive but, instead, is to protect the public from conduct that unfairly tends to destroy competition itself.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993).   Here, tyntec alleges that Syniverse's anticompetitive conduct harmed market-wide competition.  Doc. 116 at 24.  More specifically, tyntec asserts that by excluding tyntec from the U.S. ICV market, Syniverse limited customer choice and price competition.  Doc. 116 at 24.  tyntec's argument that many of its contract negotiations are "waiting for Syniverse . . . [litigation] issue to be resolved" and that companies such as Sprint and TNS expressed an interest in purchasing ICV services from tyntec but were denied that choice is unavailing.  Doc. 116, Ex. 2 at ¶ 13, Ex. 3 at ¶¶ 49-50, Ex. 22 at ¶ 14, Ex. 27 at 171:11-173:2, Ex. 33 at ¶ 13, Ex. 60, Ex. 61 at ¶ 13, Ex. 63.  tyntec points solely to Syniverse's negotiations

with Flyp as an illustration of how tyntec's exclusion from the market affects pricing. This isolated example, however, is insufficient to establish market-wide harm because it pertains to only one customer in an industry of hundreds of messaging companies and may not be representative of the market as a whole. Additionally, Flyp rejected the increased pricing offered by Syniverse. tyntec has not offered any other evidence that Syniverse otherwise has any power to control prices or restrict output in any relevant market. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) (holding that, despite evidence of increased fees, plaintiffs did not prove the ability to charge anticompetitive prices); *Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 368 (10th Cir. 1993) ("To establish a § 2 violation, a plaintiff must prove a defendant had 'the power to control prices or exclude competition' in the relevant market.").

tyntec also contends that Syniverse's exclusion has done serious damage to tyntec's plans to compete in the U.S. ICV market. Doc. 116 at 25. This contention, however, is irrelevant as a monopolist's harm, as discussed above, "must tend to cause harm to competition; unrelated harm to an individual competitor or consumer is not sufficient." *Mr. Furniture Warehouse, Inc. v. Barclays Am. / Commercial Inc.*, 919 F.2d 1517, 1522 (11th Cir. 1990); *see also Spanish Broad.*, 376 F.3d at 1075 ("[C]onduct that injures individual firms rather than competition in the market as a whole does not violate Section Two."). As such, tyntec has failed to establish harm to competition in general.

### B.  Attempted Monopolization Claim

Section 2 of the Sherman Act forbids attempts to monopolize. 15 U.S.C. § 2. "The phrase 'attempt to monopolize' means the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it...." *Gulf States*

*Reorganization Grp., Inc. v. Nucor Corp.*, 721 F.3d 1281, 1285 (11th Cir. 2013) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 785 (1946)).   The elements of an attempted monopolization are: (1) the defendant engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize the relevant market and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports*, 506 U.S. at 456.  "This anticompetitive conduct criterion captures the critical antitrust idea of harm to competition, rather than to competitors." *Spanish Broad.*, 376 F.3d at 1075.  Just as for the monopolization claim, conduct that injures individual firms rather than competition in the market as a whole is not violative of § 2 in the form of an attempted monopolization claim.  *Id.*  If a defendant's conduct proves lawful despite the defendant's possession of monopoly power in the relevant market for purposes of a monopolization claim, then the defendant's conduct could not constitute an attempt to monopolize.  *Transamerica Comput. Co., Inc. v. Int'l Bus. Machs. Corp.*, 698 F.2d 1377, 1382 (9th Cir. 1983).  Because tyntec has failed to establish harm to competition in general and because Syniverse's conduct was otherwise lawful, tyntec's attempted monopolization claim fails.

### C.  Tortious Interference Claims

Tortious interference with a contract and tortious interference with a prospective business relationship have roughly equivalent elements: (1) the existence of a contract or business relationship, (2) defendant's knowledge of it, (3) defendant's intentional procurement of the contract's breach or interference with the relationship, (4) absence of any justification, and (5) damages. *Jeunesse, LLC v. LifeWave, Inc.*, No. 6:15-cv-131-Orl-28DAB, 2015 WL 4911349, at *3 (M.D. Fla. Aug. 17, 2015); *Smith v. Ocean State Bank*, 335 So.2d 641, 642 (Fla. 1st DCA 1976) (the two claims are "basically the same cause of action").  "The only material

difference appears to be that in one there is a contract and in the other there is only a business relationship." *Smith*, 335 So.2d at 642; *see also Pilkington v. United Airlines, Inc.*, 921 F. Supp. 740, 749 (M.D. Fla. 1996).

Here, tyntec simply asserts that Syniverse was aware that tyntec acquired Iris's assets and planned to compete for many of Syniverse's existing customers and argues that "Syniverse knowingly interfered in tyntec's ongoing negotiations and existing contracts for ICV services by breaking the traditional bill and keep course of dealing and did so with a naked intent to exclude tyntec from the market." Doc. 116 at 37. These claims are exclusively predicated on tyntec's inability to peer with Syniverse under the Iris Peering Agreements. *See* Doc. 42 at ¶¶ 107-112 ("If tyntec is unable to peer with Syniverse under the current terms of the Peering Agreements, neither tyntec nor its customers will be able to honor the terms of the Customer Contracts and tyntec's customers will have no choice but to do business with an ICV other than tyntec, namely Syniverse itself or SAP."). For the reasons discussed above, these claims concomitantly fail. Syniverse had a contractual right not to renew the Iris Peering Agreements and engaging in acts expressly permitted under the terms of a contract does not constitute tortious interference. *See Networkip, LLC v. Spread Enters., Inc.*, 922 So.2d 355, 358 (Fla. 3d DCA 2006) ("No cause of action for intentional interference exists which is the consequence of a rightful action."). As such, Syniverse is entitled to summary judgment on these claims.

Accordingly, it is hereby

RECOMMENDED:

1. tyntec's Motion for Summary Judgment (Doc. 116) be denied.

2. Syniverse's Motion for Summary Judgment (Doc. 119) be granted.

**IT IS SO REPORTED** in Tampa, Florida, on August 19, 2019.


SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. Fed. R. Civ. P. 72(b)(2). A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit and waives that party's right to challenge anything to which no specific objection was made. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3); 11th Cir. R. 3-1; Local Rule 6.02, M.D. Fla.


cc:    Hon. Steven D. Merryday