UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TYNTEC INC., et al.,

    Plaintiffs,

v.                                                   CASE NO. 8:17-cv-591-T-23SPF

SYNIVERSE TECHNOLOGIES, LLC,

    Defendant.
_____/

## **ORDER**

A review of the papers, record, precedent, and scholarly literature reveals that the magistrate judge's report and recommendation (Doc. 240) warrants adoption. However, the circumstance justifies a few comments on some points the plaintiff raises in objection and on the report in general.

First, the argument that tyntec inherited a "preexisting voluntary and . . . profitable"[1] course of dealing by virtue of Iris's contract assignment is weak, at best.[2] (Doc. 250 at 20–1) Because a course of dealing, considered in the antitrust context, sheds "light upon the motivation of [the] refusal to deal," *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004), the course of dealing between Iris and Syniverse imputes no probative course of dealing to tyntec and

---

[1] *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013).

[2] *But see Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 997 F. Supp. 2d 142, 154 (D.R.I. 2014) (declining to grant a motion to dismiss because "the Court is not aware of case law that would preclude consideration of [the assignor's] direct prior course of dealing with [the defendant]").

Syniverse, who were strangers before the assignment. Although Iris and Syniverse's prior course of dealing might retain some evidentiary value on some issue and, in that sense, might acquire some "relevance," the Iris and Syniverse course of dealing establishes neither a voluntary and profitable course of dealing between Syniverse and tyntec nor a perennial course of dealing in the inter-carrier vendor (ICV) market. Both logic and the protean economics of the ICV market caution strongly to the contrary.

Second, a year into this action, tyntec offered Syniverse more than forty-thousand dollars if Syniverse would agree to a free peering relationship. tyntec argues that Syniverse manifested "exclusionary practices" by rejecting this offer and forbearing short-term profits. (Doc. 116 at 10–11) The notion that Syniverse's rejection of tyntec's eleventh-hour offer exemplifies Syniverse's "anti-competitive" motivation will not cohere. The antitrust laws obligate a court to "look back in time to the marketplace as it once was and . . . not as it now is." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013). Further, "the bringing of a lawsuit . . . may provide a sound business reason for . . . terminating [business] relations." *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 871 (2d Cir. 1962)). And Syniverse provides several other reasons for the decision to discontinue a peering relationship. Thus, because tyntec initiated the peering offers a year after suing Syniverse and because Syniverse states a reasonable basis for refusing to deal, Syniverse's refusal to accept tyntec's eleventh-hour peering offers displays no

"willingness to sacrifice short-term profits" within the contemplation of Section 2. Therefore, Syniverse's rejection of tyntec's proposals constitutes no ongoing refusal to deal and serves no useful evidentiary function.

*          *          *

Section 2 of the Sherman Act provides, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, . . . shall be deemed guilty of a felony." Although monopolistic behavior typically comprises collusive or conspiratorial conduct, antitrust law recognizes in a limited circumstance the potential for monopolistic behavior to manifest in unilateral conduct. An anti-competitive refusal to deal is one of these limited circumstances. But "refusal to deal" jurisprudence comes shrouded in "weak" and precarious doctrinal justification. ROBERT H. BORK, THE ANTITRUST PARADOX: A POLICY AT WAR WITH ITSELF 346 (1993) ("[T]he doctrinal justifications for the differences in [refusal to deal] outcome[s] appear weak."). Accordingly, a posture of restraint should guide the analysis of antitrust liability for a refusal to deal. This is not to suggest that "refusal to deal" jurisprudence lacks any proper place in antitrust jurisprudence or serves no benefit in averting monopolistic conduct; rather, this is to suggest that "refusal to deal" jurisprudence needs no further muddling — an inevitable result if unwarranted liability is imposed in a case such as tyntec's.

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), a seminal precedent for "refusal to deal" doctrine (and a case on which tyntec heavily relies), falls "at or near the outer boundary of § 2 liability," as characterized in *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004), which circumscribes *Aspen* within its idiosyncratic facts and which consequently constricts "refusal to deal" liability.

Eleventh Circuit precedent further constricts the boundary of "refusal to deal" liability and narrows the conduct that falls within the boundary. *See, e.g.*, *Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004); *Covad Communications Co. v. BellSouth Corp.*, 374 F.3d 1044 (11th Cir. 2004). At whatever undescribed boundary "refusal to deal" liability might lie following *Aspen*, *Trinko*, *Morris*, *Covad*, *Novell*, and similar precedent, Syniverse's business conduct — pervaded by deliberative, understandable, reasonable, and lucid efficiency justifications — falls somewhere outside the boundary of Section 2 liability.

tyntec's action stands consequentially distinct from *Aspen*, some of which distinctions warrant remark.[3] The parties in *Aspen* shared a longstanding business relationship that created a "joint venture"; Syniverse and tyntec were essentially strangers until the assignment of Iris's contract. The parties in *Aspen* shared a

---

[3] Although aptly summarizing the facts in, and ably applying the law of, *Aspen*, the report perhaps awkwardly analogizes Syniverse's free peering to free skiing on a competitor's mountain. However, no awkwardness in any of the report's analogies undermines the balance of the report's well-reasoned and thorough analysis.

voluntary and mutually profitable relationship; Syniverse and tyntec shared no relationship but for a contractually imposed duty induced by a third party. The *Aspen* defendant's conduct introduced a sudden and unexpected reversal into the parties' course of dealing; assuming (generously) a course of dealing between Syniverse and tyntec, Syniverse's conduct was foreseeable and anticipatorily announced. The *Aspen* defendant's conduct inflicted monetary loss on the defendant; Syniverse's conduct guaranteed higher profit.[4] The *Aspen* defendant refused to sell products to the competitor at a retail price despite the defendant's selling to others in the relevant market at a retail price; Syniverse offered to tyntec services at precisely the "retail" price offered to entities similarly situated to tyntec.[5] The *Aspen* defendant's refusal generated disgruntled consumers who lacked a meaningful, alternative product option; Syniverse's refusal generated one potentially dissatisfied

---

[4] Syniverse's charging tyntec for ICV services suggests an aim to increase short-term profit. That is, tyntec cannot reasonably argue that the only possible reason for Syniverse's terminating the free peering arrangement was to exclude tyntec from the market. If tyntec accepted Syniverse's offer, the result would guarantee immediate short-term profit for Syniverse. Thus, although Syniverse's rejection of free peering "may suggest a hard-nosed intent to undo rivals" (which is unactionable conduct by itself), the rejection suggests no "inten[t] to forgo profits." *Novell*, 731 F.3d at 1078. Even if cast as "raising rivals' costs," as attempted by tyntec, that description fails to "displace *Aspen* and *Trinko*'s profit-sacrifice test in the narrow world of refusal to deal cases." *Novell*, 731 F.3d at 1079. tyntec clearly cannot satisfy *Trinko*'s profit-sacrifice test. The record lopsidedly establishes that Syniverse retained a profit-seeking incentive throughout the entirety of Syniverse's negotiations with tyntec. The desire to defeat competition, if coupled with legitimate business or efficiency explanations, defeats antitrust liability.

[5] Although tyntec disputes similarity to these entities, tyntec itself analogizes the business services of these entities to tyntec's own business services.

customer, which ultimately denied Syniverse's offer for services and pursued an alternative.[6] The *Aspen* defendant offered no legitimate business justification or efficiency defense for the challenged conduct; Syniverse offers an array of business justifications, all of which comport with a goal to perpetuate profit.

Given these differences, permitting liability for Syniverse's conduct is to mistakenly permit the proverbial camel to pass through the unusually impassable "narrow-eyed needle of refusal to deal doctrine." *Novell*, 731 F.3d at 1074. "[T]he limits on the administrative capacities of courts to police market . . . transactions,"[7] the judiciary's duty to foster predictable rules and results on which a business can rely, and the "presumption of freedom [ ] appropriate to a free market economy"[8] — even taken singularly, but especially taken collectively — commend judicial restraint unless distinct evidence reveals the refusal as predatory. As *Novell* states, "If the doctrine . . . must err still to some slight degree, perhaps it is better that it should err on the side of firm independence." 731 F.3d at 1076.

In sum, tyntec fails to establish a causal link between Syniverse's ostensibly "anti-competitive refusal" and injury to consumers and competition, Syniverse's

---

[6] Of course, tyntec argues that many more customers will become dissatisfied because Syniverse will eventually charge monopolistic prices — after Syniverse routs tyntec out of the market. Determining the accuracy of broad, speculative, and attenuated assumptions such as this, even if correct, falls outside the judiciary's expertise. Further, the *Aspen* defendant and plaintiff were the only two participants in the construed "market," but more options exist for ICV customers. Thus, tyntec's argument falters in any event.

[7] *Novell*, 731 F.3d at 1072.

[8] BORK, THE ANTITRUST PARADOX, at 344.

behavior fails to qualify as "predatory" conduct within the meaning contemplated by Section 2, and the magistrate judge's cogent report offers still other persuasive reasons for granting summary judgment in favor of Syniverse.  However, if summary judgment in favor of Syniverse is proper for no other reason, "[w]here an efficiency potential appears in a case involving an individual refusal to deal, and there is no clear evidence that the purpose of the refusal was predatory, courts," philosopher-kings, central planners, "experts," and many others are ill-equipped and ill-advised to meddle in an independent industry by imposing antitrust liability for routine refusals to deal.  BORK, THE ANTITRUST PARADOX, at 346.  History suggests that in any event the undertaking would not meet with success.

The magistrate's report and recommendation (Doc. 240) is **ADOPTED**.  tyntec's motion (Doc. 116) for summary judgment is **DENIED**, and Syniverse's motion (Doc. 119) for summary judgment is **GRANTED**.  The clerk is directed to enter judgment in favor of Syniverse and against tyntec, and the clerk is directed to close the case.

ORDERED in Tampa, Florida, on May 29, 2020.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE